IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION


UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   ) Cause No.
   v.                              ) 1:22-cr-00143-RLY-KMB-2
                                   ) Indianapolis, Indiana
RICHARD SMITH,                     ) April 10, 2025
                                   )
            Defendant.             ) 2:10 p.m.


BEFORE THE HONORABLE RICHARD L. YOUNG

TRANSCRIPT OF PROCEEDINGS
PLEA AND SENTENCING


APPEARANCES:

For the Plaintiff:          Tiffany J. Preston
                            United States Attorney's Office
                            10 West Market Street
                            Suite 2100
                            Indianapolis, IN  46204


For the Defendant:          James A. Edgar
                            J. Edgar Law Offices, PC
                            1512 North Delaware
                            [!ADDRESS-B2]
                            Indianapolis, IN  46202


Court Reporter:             Elizabeth Taylor Culiver, RPR, FCRR
                            United States District Court
                            101 N.W. MLK, Jr. Blvd.
                            Evansville, IN  47708
                            (812) 499-8782

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

2

# **I N D E X**

**PAGE**

**JEREMY BRICE**

Direct Examination By Ms. Preston....................    13
Cross Examination By Mr. Edgar......................    22
Redirect Examination By Ms. Preston.................    25

1          (In open court.)

2              THE CLERK:  All rise.  Court is in session.  Please

3      be seated.

4              THE COURT:  Good afternoon.

5              MS. PRESTON:  Good afternoon, Your Honor.

6              THE COURT:  We're here today in the matter of the

7      United States of America vs. Richard Smith, 1:22-cr-143.

8      Mr. Smith is here in person in custody with his attorney,

9      James Edgar.  United States is here by Assistant United States

10     Attorney, Tiffany Preston.

11             My record reflects on June 6, 2024, Court found a

12     factual basis for the defendant's plea to Count 1, conspiracy

13     to commit sexual exploitation of a minor, a violation of 18

14     U.S. Code Section 2251(a) and (e) and 2.  Court further found

15     defendant's plea was knowingly and voluntarily made.

16             On January 21, 2025, defendant plead guilty to

17     Count 6 of the original indictment, Count 4 of the trial

18     indictment.  Court found defendant to be fully competent and

19     capable of entering an informed plea.  In Count 6, plea was to

20     possession of visual depictions of minors engaged in sexually

21     explicit conduct, a violation of 18 U.S. Code Section 2252A.

22             On April 3, 2025, there was a Sentencing Memorandum

23     filed by counsel for the defendant.  April 7, 2025, Sentencing

24     Memorandum filed by the Government, and then also on April 7,

25     2025, a motion for restitution filed by the Government and

4

1     then today is the day set for sentencing.

2              Is that your understanding of the record, Mr. Edgar?

3              MR. EDGAR:  That is, Your Honor.  Thank you.

4              THE COURT:  Ms. Preston?

5              MS. PRESTON:  Yes, Your Honor.

6              THE COURT:  All right.  Okay.  Mr. Edgar and

7     Mr. Smith, do you want to come up to the lectern?

8              Mr. Smith, we're going to review the information

9     contained in your Presentence Investigation Report.  If at any

10    time during this proceeding you do not understand what we're

11    discussing or you have a question about anything, will you

12    make sure to make your attorney aware of your question so we

13    can make our best attempt to answer that for you?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  All right.  Mr. Smith, have you had an

16    opportunity to review the information contained in the

17    Presentence Report?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  And, Mr. Edgar, have you had an

20    opportunity?

21             MR. EDGAR:  Yes, Your Honor.

22             THE COURT:  And, Ms. Preston, have you had an

23    opportunity?

24             MS. PRESTON:  Yes, Your Honor.

25             THE COURT:  All right.  I note no objections from the

1    Government.  The defendant has filed several objections.

2    Other than the objections, Mr. Smith, based upon your review

3    of the Presentence Investigation Report, do you find its

4    contents to be true and accurate?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  All right.  Let's go ahead and deal with

7    these objections first, Mr. Edgar, and then we'll continue on

8    with the other information contained in the Presentence

9    Report.

10             There's an objection to -- objection number one to

11   paragraph 29.  Defendant Smith denies that the phone had 5,000

12   images.  Do you wish to continue on with that objection?

13             MR. EDGAR:  I don't think Mr. Smith wants to continue

14   on with that objection, Your Honor.

15             THE COURT:  Is that correct?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  All right.  Okay.  So you're withdrawing

18   objection number one?

19             THE DEFENDANT:  Yes, sir.

20             THE COURT:  All right.  Objection number two as to

21   paragraphs 34 through 36.  Smith not only accepted

22   responsibility but successfully completed in a proffer with

23   the Government for which no motion was filed.

24             Do you wish to continue on with that objection,

25   Mr. Edgar?

 1                    MR. EDGAR:  I do, Judge.  I think that one's fair.

 2                    THE COURT:  Okay.  You wish to address it any

 3      further?

 4                    MR. EDGAR:  So the Government has asked that

 5      Mr. Smith be deprived of all points for his pleas of guilty.

 6      Presumably that's related to the timing.  This may bleed into

 7      some of the arguments that I make at the end of this case, but

 8      Mr. Smith very early on communicated his intention to accept

 9      responsibility to me.  We accepted the Government's invitation

10      to sit down with them, had a very frank dialogue.  Ms. Preston

11      can correct me if I'm wrong.  By the way, Judge, she's my

12      favorite AUSA, so nothing I say can be interpreted in any way

13      as criticism of Ms. Preston.  But the Government was happy.

14                    THE COURT:  You -- I must say you've both done a very

15      thorough and professional job in this case.

16                    MR. EDGAR:  Thank you, Your Honor.  And I need to be

17      careful paying compliment to Assistant U.S. Attorneys because,

18      you know, praise from defense counsel sometimes gets

19      interpreted badly by other people, but she's great.  She's

20      very reasonable.  She's very professional.  Extremely

21      thorough.  We've tried cases together, so I'm a little worried

22      of some of what I say today might be taken as criticism of

23      her, and none of it should be interpreted that way.  But the

24      Government was happy with the information.  It was calculated

25      to prevent the further dissemination of the images.  The

1    feedback I got at that time was that the information -- that

2    that was likely to be successful in the preventing the further

3    dissemination of the images, and it was a good meeting, and we

4    left there with a positive outlook on actually getting the

5    case resolved, and then we received a plea offer in the case

6    later.  Of course, as an inherent factor, inherent part of the

7    federal system, you have to go and in good faith say

8    everything you know with the hope that you'll receive some

9    benefit for it.  No guarantees.

10              And so what we got back was a plea offer which had

11   every conceivable enhancement in that plea offer, everyone of

12   them.  All the ones you see in the PSI, and recommend --

13   obviously it's going to recommend a life sentence, and

14   Mr. Smith is not alone, so I have this kind of keyhole

15   perspective as a defense lawyer.  Like, I don't know the big

16   picture.  I'm bias.  But he's not alone because I've had other

17   clients in the last few years put in the same situation where

18   they're trying their best to plead guilty and then they get

19   these terrifying plea offers with every possible enhancement

20   programmed in there, and then I'm in that position of saying,

21   hey, sign this.  And I think based on what you read in the

22   PSI, you can see that Mr. Smith is, probably due to some

23   childhood issues and other post traumatic stress disorder

24   related battles that he has to struggle with.  He's not prone

25   to trust.  He's not prone to do that.  Why would he?  That's

1  my bias perspective.  So it put us back on our heels, and we

2  had to go back and forth and back and forth to try and get the

3  case resolved, yes.  There was a lot of back and forth, and it

4  may -- you know, it might even look like the lawyers are sort

5  of battling who's at fault or who's to blame, but you were

6  there for part of it and you saw what we went through to get

7  this case resolved.

8         Ultimately, he pled guilty to Count 6 as well, and we

9  got the case resolved, but it took a lot of talking Mr. Smith

10  off the wall.  You can trust.  You can do this.  You know,

11  ultimately, I'm going to say this.  I don't mean it to sound

12  like undue flattery, but the guidelines are not in our favor

13  ever.  I have more argument on that.  So my advice to the

14  client is you have to trust the judge because all that comes

15  down to the judge.  So we finally arrived at that point and,

16  yeah, I'm going to admit it took some time to get there.

17  Mr. Smith and I had our arguments.  I mean, he exasperated me.

18  I'm just going to say that.

19         THE COURT:  Well, difficult case --

20         MR. EDGAR:  Yeah.

21         THE COURT:  -- to say the least.

22         MR. EDGAR:  Yeah.  But the record also bears that

23  out, so I think it's fair to say, and he would admit that, but

24  we always comes back, and he's always apologetic and

25  respectful.  So we got there.  We got there.  I'm not saying

1    he was entitled to all three points, but I think there is

2    something there.

3            The Court will recall that we are the ones who filed

4    the waiver of trial by jury, and I think it's very telling

5    that Mr. Smith recognized it was important to spare the jury

6    the view of these images.  He saw that as an important factor

7    and, you know, with -- with respect, it's a disappointment to

8    me that the Government will not seriously consider waiver of

9    trial by jury, especially in cases like this.  They have a

10   blanket prohibition, and I don't think that works well for the

11   system, but I also think that it -- it tends to show that

12   Mr. Smith has tried to operate in good faith, and he should

13   get the points.

14           THE COURT:  Okay.  Ms. Preston, any response?

15           MS. PRESTON:  Your Honor, we filed a detailed

16   response in our brief and so I won't belabor that.  I will, of

17   course, echo what Mr. Edgar has said and, again, of course, my

18   comments as well.  I love working with Mr. Edgar, and it is

19   true Mr. Smith came in.  He proffered with the United States.

20   He provided information to the United States.  He did so after

21   charges and after his codefendant, his coconspirator, had

22   already provided information.  That information we believe was

23   truthful but ultimately did not lead to a cooperation

24   agreement simply because the information he provided did not

25   yield anything that led to charges in the offense or better

 1    understanding than we already had.

 2          Now, with respect to -- because this was not in my

 3    brief, the enhancements in this case, Your Honor, are driven

 4    not by choices made by the United States but by the

 5    defendant's criminal conduct, and we can't wipe those away in

 6    an effort to resolve the case.  If the conduct applies and the

 7    enhancement applies, we say it applies.  It's the 3553(a)

 8    factors where that we weigh in discretion comes into play.  As

 9    Your Honor knows, we've been before this Court many times on

10    this case, and the United States on many occasions to resolve

11    this matter via Plea Agreement with this particular defendant,

12    including offers that allowed him to argue certain

13    enhancements under the law, of course, reserving, as we have,

14    acceptance and a decision if he's truly accepted

15    responsibility.

16          It is my view, Your Honor, given what I said in my

17    brief, and I'll be very short with it, that, one, he

18    strategically chose to only plead guilty to 1 and 6 of this

19    indictment.  He did not choose to plead guilty to all counts

20    in the indictment.  He did so only on the eve of trial, so

21    certainly it was not timely.  And he continues to still take

22    certain positions that I think are reflective of his lack of

23    acceptance of truly what happened here and those arguments are

24    all set forth in my brief, Your Honor, so I'll rest on those.

25          THE COURT:  Thank you.  Defendant did plead guilty to

 1    Count 1 and Count 6.  The Court certainly understands the

 2    position of the Government here.  The defendant, by pleading

 3    guilty, avoided this matter to be tried.  It would have been a

 4    lengthy trial, a very difficult trial for all involved.  The

 5    Government would not waive jury.  The Court would have had to

 6    bring a jury in here to view the evidence in this case, which

 7    is, to put it mildly, mostly horrific evidence, and the

 8    defendant pleading to Count 1 and 6, which the Government

 9    allowed him to do -- so the Court is going to give him

10    consideration for that adjustment for two levels.  The

11    Government is certainly -- in its discretion is not going to

12    move for one additional level under 1(b) and the Court

13    certainly understands that position.  So that objection will

14    be sustained.

15            MR. EDGAR:  Your Honor, since --

16            THE COURT:  Two levels.

17            MR. EDGAR:  I'm sorry.  Since cooperation or

18    attempted cooperation was specifically mentioned, I would --

19    if a transcript is prepared, I would ask that that be redacted

20    or omitted or kept under seal.

21            THE COURT:  I don't quite understand.

22            MR. EDGAR:  I think it's in Mr. Smith's best interest

23    and his safety if a transcript of this hearing is requested at

24    a later date, that any mention of the cooperation be kept

25    under seal.

1          THE COURT:  Oh, okay.  All right.  I have no problem

2   with that.

3          MS. PRESTON:  No objection, Your Honor.

4          THE COURT:  So ordered.

5          All right.  Objection number three regarding

6   paragraph 41.  Defendant Smith denies the images actually

7   depict sex acts.  Do you wish to continue with that objection?

8          THE DEFENDANT:  Yes, yes.  Well, I'm kind of confused

9   on that.  Are we talking about the images on the possession or

10  is it from the exploitation of the videos or -- I'm confused

11  where it's coming from because it said on some of the stuff

12  that I had read that those -- that that Count 1 stemmed from

13  the videos.  So the video that I had seen -- I don't know if

14  there was multiple videos taken, but the video I had seen,

15  there was -- there was never any genitalia in the one video

16  that I seen, and that's what I had told my lawyer from --

17  Mr. Edgar from the beginning, so I'm --

18          THE COURT:  Mr. Edgar, anything further on that?

19          MR. EDGAR:  I don't have anything further on that,

20  Judge.  That has been Mr. Smith's position from the start,

21  that at least one of these videos, if there was a sex act, it

22  was out of the frame.  I know that the -- the Government -- I

23  believe they have a witness ready to testify as to the

24  contents of that video, so it would just be ultimately the

25  Court's decision.

 1              THE COURT:  Ms. Preston?

 2              MS. PRESTON:  Yes, Your Honor.  We do have Detective

 3    Sergeant Jeremy Bryce who has reviewed the videos here.  He

 4    was a forensic expert in this matter, and he can very briefly

 5    testify as to what he saw in those videos, and that it matches

 6    the descriptions which were consistent with the guilty plea

 7    and the factual basis to which Mr. Smith admitted.

 8              I'm certainly -- I don't think, given the

 9    description, it's necessary to play them in Court for anyone

10    to see.  I think the descriptions themselves clearly depict a

11    sexual act by definition as set forth in the sentencing

12    guidelines, so we are prepared to briefly call the detective

13    sergeant to prove up that fact.

14              THE COURT:  All right.  You may.

15              Mr. Edgar, you and Mr. Smith can have a seat.

16              MR. EDGAR:  Thank you, Your Honor.

17         **JEREMY BRICE, GOVERNMENT'S WITNESS, SWORN**

18                   **DIRECT EXAMINATION**

19    BY MS. PRESTON:

20    Q.    Good afternoon, Detective Sergeant.  Can you please

21    introduce yourself to the Court and spell your first and last

22    name for the court reporter, please?

23    A.    Detective Sergeant Jeremy Brice.  Spelling of the first

24    name is J-e-r-e-m-y.  Last name Brice, B, as in boy, r-i-c-e.

25    Q.    Prior to coming to Court today, did you provide to the

1    United States what we have marked in our sentencing memorandum

2    as Exhibit E, that being your curriculum vita setting forth

3    your qualifications?

4    A.    I did.

5    Q.    And are those qualifications correct?

6    A.    They are.

7    Q.    In addition to that background and training, which is

8    set forth in Exhibit E, are you familiar with the federal

9    definition of child pornography?

10   A.    I am.

11         MS. PRESTON:  And I believe as set forth in our

12   filing regarding your expert qualifications, Mr. Edgar, do you

13   stipulate that Detective Sergeant Brice is an expert in the

14   field of forensic examination of devices?

15         MR. EDGAR:  We would agree with that, Your Honor.

16   BY MS. PRESTON:

17   Q.    So moving on, Your Honor, I want to keep this as

18   efficient as possible.  For the record, Detective Sergeant,

19   did you work on the matter of the United States of America vs.

20   Richard Smith and Jamie Powell?

21   A.    I did.

22   Q.    In what capacity?

23   A.    I conducted the digital forensic examinations of the

24   digital evidence that was provided to me, conducting the

25   acquisition of the devices, as well as the examination of the

1    data contained in those devices.

2    Q.    And did that examination include Ms. Powell's A50

3    smartphone Model SMS506DL?

4    A.    It did.

5    Q.    And did it also include Mr. Smith's Samsung Galaxy Note

6    20 Model SMN981U?

7    A.    It did.

8    Q.    Based on that examination, did you create several

9    summary exhibits in this matter?

10   A.    I did.

11   Q.    And have you reviewed those prior to coming to court

12   today?

13   A.    Yes, I have.

14   Q.    And one of them, I believe, is on the screen in front of

15   Your Honor and perhaps in front of you since your screen is

16   not working, and it is referred to the summary of Mr. Smith's

17   Samsung Galaxy Note 20, correct?

18   A.    Yes.

19         MS. PRESTON:    And for the record, Your Honor, I

20   believe that is Exhibit D in the sentencing memo.

21   BY MS. PRESTON:

22   Q.    And you also created a summary marked as Exhibit I of

23   your findings with respect to Ms. Powell's cellular device; is

24   that correct?

25   A.    I did.

1    Q.    Did you -- could you very briefly describe how you

2    extracted those devices, including best practices?

3    A.    I did.  When the evidence comes into our office, we do

4    various things to ensure that the evidence is not manipulated

5    in any further way, including putting it on airplane mode and

6    disconnecting it from any wireless networks.  In doing so, it

7    prevents any tampering of the data.  We then use forensic

8    software to extract the data in as complete of a way as

9    possible.  In these cases, I did a -- what's called a full

10   file system extraction, which would be the most complete way

11   to acquire data using modern technologies.  Using that

12   information, we were able to then process that data and put

13   that full file system data into a readable format for our

14   examination.

15   Q.    Okay.  And I'd like to turn your attention, given

16   Mr. Smith's withdraw of his objection regarding the number of

17   images and videos of child sex abuse material on his phone.

18   Let's turn next to the videos that were set forth in Counts 1,

19   2, 3 -- 1, 2, and 3 of the indictment and the image described

20   in Count 4.  Okay?

21   A.    Okay.

22   Q.    As part of your forensic analysis in this case, have you

23   reviewed those videos and that image?

24   A.    I have.

25   Q.    And did you create at one point in time a table

1   including the descriptions of those videos?

2   A.    I did.

3   Q.    And you have watched them from the beginning to the end;

4   is that right?

5   A.    Multiple times, yes.

6         MS. PRESTON:  And for the record, Your Honor, they

7   are described not only in the indictment but in the stipulated

8   factual basis as to Count 1.  And I will pull up now the

9   exhibit to which Detective Sergeant Brice is referring, and

10  that being Exhibit K to the sentencing memo.  And I'm going to

11  try to make it a little larger here.

12  BY MS. PRESTON:

13  Q.    Okay.  Did you assist -- and this is -- Exhibit K is

14  Counts 2, 3, and 4.  Do you have that in front of you, sir?

15  A.    I do.  I believe this is the correct form.

16  Q.    That's correct.  I'm sorry.  I didn't bring your glasses

17  today.

18        Looking at videos described in Counts 2 and 3,

19  particularly the descriptions of those videos, are those

20  descriptions consistent with your examination of those videos

21  and were contained on Mr. Smith's devices?

22  A.    They are.

23  Q.    And for the record, did the video depicted in Count 2

24  ending in 9029 depict Minor Victim 1?

25  A.    It did.

1    Q.    Was it approximately 16 seconds in length?

2    A.    It was.

3    Q.    And did that video depict Minor Victim 1 in a onesie

4    that was unsnapped laying down on her back?

5    A.    Yes.

6    Q.    Is Mr. Powell's hand showing her tattoos visible and

7    seen prying open Minor Victim 1's genitalia?

8    A.    It was.

9    Q.    Did she use her index finger and thumb in order to pry

10   open her genitalia?

11   A.    She did.

12   Q.    Was the focal point of that video file the opening of

13   Minor Victim 1's genitalia?

14   A.    Yes.

15   Q.    And could you then hear in the video another child's

16   voice saying, "What are you doing?"

17   A.    I did hear that.

18   Q.    Did Ms. Powell's hand then remove off of the genitalia

19   of Minor Victim 1?

20   A.    Yes.

21   Q.    Accordingly, Detective Sergeant Brice, does the video

22   described in Count 2, which is the subject matter of Count 1,

23   the conspiracy count, depict the penetration, however slight,

24   of the genital opening of Minor Victim 1 by someone's hand or

25   finger?

*BRILL - DIRECT/PRESTON*

1   A.    It did.

2   Q.    Did it also depict the intentional touching, not through

3   the clothing of Minor Victim 1's genitalia?

4   A.    It did.

5   Q.    And was she under the age of 16 at the time?

6   A.    Yes, she was.

7   Q.    And that video found its way from Ms. Powell's cellular

8   device onto Mr. Smith's cellular device; is that correct?

9   A.    That is correct.

10  Q.    I'd like to turn now to Count 3.

11        MS. PRESTON:  Which, again, these videos, Your Honor,

12  were part and parcel of Count 1 to which Mr. Smith pleaded

13  guilty.

14  BY MS. PRESTON:

15  Q.    Did you review the video ending in 7725?

16  A.    I did.

17  Q.    And is the description as set forth in Exhibit K

18  consistent with your review of that video?

19  A.    It is.

20  Q.    Is that video approximately seven seconds in length?

21  A.    Approximately eight seconds is what I had, but yes.

22  Q.    Does it depict a female subject consistent with Powell,

23  again, appearing to change Minor Victim 1's diaper?

24  A.    Yes.

25  Q.    Did she then position the camera between the legs of

 1   Minor Victim 1 who was in an unsnapped onesie with no diaper?

 2   A.    Yes.

 3   Q.    Can Powell then be seen placing her head between Minor

 4   Victim 1's feet and proceed to kiss Minor Victim 1's toes?

 5   A.    Yes.

 6   Q.    Does she then place her head and mouth on Minor

 7   Victim 1's exposed genitalia?

 8   A.    She does.

 9   Q.    And began to kiss her mouth onto Minor Victim 1's

10   exposed genitalia?

11   A.    That is what I observed.

12   Q.    Does she then raise her head and repeat the action

13   again?

14   A.    She did.

15   Q.    And then kiss Minor Victim 1's feet gazing at the camera

16   as she's doing so?

17   A.    Yes.

18   Q.    And, again, from your review then of this record, does

19   the video ending in 7725 depict contact between Ms. Powell's

20   mouth and the genitalia, namely the vulva of Minor Victim 1?

21   A.    Yes.

22   Q.    Turning finally to the image described as image number

23   17.  Does that image -- have you reviewed that image as well?

24   A.    I have.

25   Q.    And it is the subject matter of Count 4 of the original

```
 1    indictment, correct?

 2    A.    Yes.

 3    Q.    Okay.  And does it depict Ms. Powell's hand with her

 4    tattoos visible using a thumb to pry open Minor Victim 1's

 5    genitalia?

 6    A.    Yes.

 7    Q.    So, again, based or your review, does that image depict

 8    the penetration, however slight, of the genital opening of

 9    Minor Victim 1 by hand or finger?

10    A.    It does.

11    Q.    All right.  And it is also depicting intentional

12    touching not through the clothing of Minor Victim 1's

13    genitalia when she was under the age of 16; is that correct?

14    A.    Yes.

15    Q.    Based on your review of those videos and that image

16    which were the subject matters of 1, 2, 3, and 4 of the

17    original indictment, does that depict child pornography by

18    federal definition?

19    A.    It does.

20    Q.    Including a sex act?

21    A.    Yes.

22         MS. PRESTON:  Your Honor, I have no further questions

23    for the witness on this particular objection.

24         THE COURT:  Thank you.

25         Mr. Edgar, any questions for the witness?
```

 1              MR. EDGAR:  I do have some cross, Judge.  Would

 2   Mr. Smith accompany me for this?

 3              THE COURT:  He can if he wishes.

 4                      **CROSS-EXAMINATION**

 5   BY MR. EDGAR:

 6   Q.    Sir, regarding the image with the lengthy number ending

 7   in 9029, I believe that's a 16 second video?

 8   A.    Yes.

 9   Q.    Where did you, yourself, locate that image -- that

10   series of images?

11   A.    That video was located on both devices, both the female

12   codefendant's as well as Richard Smith's.

13   Q.    And were you able to determine when that file was

14   actually received or placed on Mr. Smith's phone?

15   A.    There would have been four copies of that video on his

16   phone, and they would've all been on January 28th of 2021 with

17   varying time stamps all around between 3:11 and 3:58 p.m.

18   Q.    Can you elaborate on that, please?  Does that tell us

19   when those images actually appeared on the phone that we're

20   talking about?

21   A.    Yes.  So the way --

22              THE COURT:  You're talking about Mr. Smith's phone?

23              MR. EDGAR:  Correct.  Thank you, Judge.

24   A.    So from our understanding of the way the videos cross

25   all of the images and videos were transferred from one phone

 1    to the other, they were transferred there, placed into a

 2    secure folder, an encrypted folder on that phone, and so we

 3    were able to get some modification date stamps of when those

 4    were placed on the phone, and so we had copies of it.

 5            And I misspoke a little bit earlier.  There was one

 6    copy that was on January 22nd of 2021, and then three copies

 7    that were on January 28th of 2021 that were placed on that

 8    device based on the modification date stamps that we located

 9    forensically on those images -- sorry, on the video.

10    BY MR. EDGAR:

11    Q.    Are you able to tell us if Mr. Smith actually accessed

12    those files?

13    A.    There would not be any forensic information to show that

14    he specifically accessed those files.  I can see that based on

15    the modification stamp, the date stamp, that's when they were

16    placed on the device, but I can't tell you, you know, that the

17    -- the user specifically accessed them at certain times.

18    Q.    Can't tell us whether it was ever opened?

19    A.    In order for it to be placed on the device, though, it

20    would've had to have been opened in a way to copy it.

21    Q.    You couldn't do that just by copying one -- the contents

22    of OneDrive to the phone?

23    A.    I guess in order to copy the file, you'd have to

24    manually, I guess, open the file to copy it.  I see -- I guess

25    you're trying to get to, like, did he actually view the full

R. 139 – CROSS/EDGAR

24

1   video?  No, I wouldn't have any date stamp to say every time

2   that full video would be viewed.

3   Q.    Is it possible to batch -- sort of copy those over in a

4   batch?

5   A.    Yeah, that's perfectly possible and likely did occur in

6   this case.

7   Q.    Okay.  Now, the image with the long number ending in

8   7725, Mr. Smith's position has been that if there was a sex

9   act, it was not depicted in the frame of that image.  Do you

10  understand what I'm trying to describe?  It was a horrible

11  question.

12        Can you tell us whether the sex act is actually

13  depicted in the frame, or do you have to use your imagination

14  to figure out what was going on?

15  A.    In the video itself, you can't see Minor Victim 1's

16  genitalia, but when the act did occur and the mouth did touch

17  the vulva area, you can see the -- the skin or the pubis mons,

18  I guess, bulge in a way to where you can see that there was

19  contact made with the vulva, but no, you can't see the actual

20  genitalia in the -- in the framing of it.

21        MR. EDGAR:  Okay.  That may be all the questions I

22  have.  Is there anything else you wanted on that?

23        THE DEFENDANT:  I mean, when I -- when I did the

24  proffer -- when I first did the proffer --

25        THE COURT:  Hold on.

```
 1                THE DEFENDANT:  Sorry.

 2                THE COURT:  Talk to your attorney first.

 3                (Off the record.)

 4                MR. EDGAR:  It sounds like that's more in the line of

 5   testimony from Mr. Smith rather than a question for the agent.

 6   I think that's all the questions we have.

 7                THE COURT:  Thank you.  Ms. Preston?

 8                MS. PRESTON:  Yes, Your Honor, if I may.
```

**REDIRECT EXAMINATION**

```
10   BY MS. PRESTON:

11   Q.    I want to turn back to Exhibit D, if we can.  And where

12   did -- if you're looking at Exhibit D, it says in Exhibit D

13   that the files were filtered to a folder.  And that folder had

14   a name, didn't it?

15   A.    Yes.

16   Q.    What was the name?

17   A.    The name of the folder was "incestuous pedophile

18   mother."

19   Q.    And when -- and that folder was contained on Mr. Smith's

20   phone, correct?

21   A.    That is correct.

22   Q.    How would you go about making a folder with that

23   specific title?  It didn't come with the phone, right?

24   A.    That's correct.  You would've had to manually create

25   that folder name.
```

1   Q.    In addition to that, were there other file names that

2   you saw on some of the videos and images that are depicted --

3   or sorry, that were stored onto Mr. Smith's phone?

4   A.    Yes.

5   Q.    And I want to scroll down here to January 22nd, 2021.

6   Do you see one said title -- or sorry, a few of those said

7   titles there?

8   A.    I do.

9   Q.    And can you please read those into the record?

10  A.    So January 22nd, 2021, there was four specific file

11  names that I located that were manually created.  One of them

12  was "almost 2 year old" and then --

13          THE COURT:  Excuse me.  And these are on Mr. Smith's

14  phone?

15          THE WITNESS:  Yes, they are.

16  A.    "Almost 2 year old," and then it had Minor Victim 1's

17  name, "baby cunt," and then a bracket with a 1.jpg.  So it's

18  going to be an image file with that file name.  There was also

19  another file name "more of" and it had Minor Victim 1's name,

20  "almost 2 year old baby cunt.jpg."  And then there's another

21  file called "Jamie Powell 39" with -- and then, again, Minor

22  Victim 1's name, "2 panty play.jpg."  And, again, "almost 2

23  year old" and Minor Victim 1's name, "baby cunt.jpg."

24  BY MS. PRESTON:

25  Q.    Now, those titles, again, weren't naturally created when

```
 1   the video or image was created by Ms. Powell's phone, correct?

 2   A.    That is correct.

 3   Q.    That is a title that had to have been selected by the

 4   user of the device, correct?

 5   A.    Yes.

 6   Q.    And who was the user of that device?

 7   A.    That would have been Richard Smith.

 8   Q.    And the titles of those, just by way of example, images

 9   were consistent with what the images showed; is that right?

10   A.    Yes.

11   Q.    Indicating that, at least for those, they had been, in

12   fact, opened, correct?

13   A.    Yes.

14   Q.    And the entire folder had a title that matched the types

15   of images and videos that were in Mr. Smith's phone, correct?

16   A.    That is correct.

17             MS. PRESTON:  No further questions, Your Honor.

18             THE COURT:  Anything further, Mr. Edgar?

19             MR. EDGAR:  I don't think we have any questions on

20   that, Judge.  Mr. Smith has continued to offer me comments.

21   Perhaps that would be appropriate testimony from him, but I

22   don't know if it's the best way to proceed, but no questions.

23             THE COURT:  Sir, thank you very much for your

24   testimony.  You may step down.

25             THE WITNESS:  Thank you.
```

1      *(Witness excused.)*

2          THE COURT:  Mr. Edgar, would you and Mr. Smith come

3      back up?

4          Based on the testimony we've heard here today and the

5      Court's review of the file and recalling the stipulated

6      factual basis, the four level enhancement is appropriate here,

7      and, of course, United States Code defines sexual act, among

8      others, by penetration, however slight, of the anal or genital

9      opening by -- of another by hand or finger or by any object

10     with the intent to abuse, humiliate, harass, degrade, or

11     arouse or gratify the sexual desire of any person.  That

12     applies here regarding file number referred to in paragraph 22

13     of the Presentence Report, last four digits 9029, and, of

14     course, the testimony we just heard from the witness regarding

15     the naming of the files.  Certainly Mr. Smith had to view

16     these files to be able to have such a descriptive title of the

17     file.  So that objection will be denied.  And that

18     appropriate -- four level enhancement at paragraph 41 is

19     appropriate.

20         Okay.  Objection number four.  Smith did not engage

21     in distribution.  Smith merely received the images from the

22     flash drive.  Do you wish to continue with that objection?

23         THE DEFENDANT:  No.

24         THE COURT:  Do you wish to withdraw that objection,

25     Mr. Smith?

1          THE DEFENDANT:  I don't know what to do, Your Honor,

2    to be honest.  I don't know what to do.

3          MR. EDGAR:  May I have a moment, Judge?

4          THE COURT:  You may.

5          (Off the record.)

6          MR. EDGAR:  He would like to maintain the objection,

7    Judge.  In summary, he denies that he distributed any images

8    to Jamie Powell.  He may have viewed them with her.

9          THE COURT:  All right.  Any response, Ms. Preston?

10         MS. PRESTON:  Yes, Your Honor.  As set forth on -- in

11   our sentencing memorandum and as set forth in Exhibit D, what

12   the forensics show in this case, Your Honor, is that the

13   offense -- that's the test.  The offense itself and the

14   offense is conspiracy to sexually exploit a child involved

15   distribution.  Here as -- if you recall from my brief, as well

16   as the evidence in this case, Mr. Smith, quite persistently

17   and obsessively, asked Ms. Powell to produce images and videos

18   depicting sexually explicit conduct of her daughter.

19   Ms. Powell, because of their conspiratorial agreement, agreed

20   to create those images and videos, and they were not created

21   for Ms. Powell.  They were created for Mr. Smith.  Part in

22   parcel of this conspiratorial agreement contemplated

23   distribution, which is forensically what we saw happen.

24         The images and videos were created by Ms. Powell of

25   Minor Victim 1 while they were at the Laser Center.  Then, and

1    as admitted by this defendant in his change of plea hearings,

2    Ms. Powell then distributed those images and videos to

3    Mr. Smith who, yes, received them.  So yes, the offense

4    involved distribution.  That was the entire point of this

5    conspiracy, to satisfy the sexual gratification of this

6    particular defendant by the viewing of the images and videos

7    that they conspired to create.  The forensics prove that fact,

8    Your Honor.  As you can see in Exhibit D of the Sentencing

9    Memorandum, the images and videos are first created on

10   Powell's phone, then they are shown to be saved at a later

11   time onto Mr. Smith's phone.  Mr. Smith admitted in the

12   stipulated factual basis to the -- we used words transmission,

13   which is also in the sentencing guidelines, the transmission

14   of those images and videos.  He also told Your Honor in his

15   own words how they accomplished that distribution.  That being

16   either through a Bluetooth to Bluetooth device or also

17   potentially via flash drive.  And so the offense of

18   conviction, yes, involved distribution.

19          In addition to that, Your Honor, we are also aware,

20   both forensically and from Mr. Smith's admissions, that he had

21   a collection of internet based child pornography of more than

22   5,000 images.  He shared some of those images and videos,

23   approximately 2,500 of them, with Ms. Powell, and those images

24   and videos matched those hash values found on this phone and

25   were located on her phone.  And so based on that evidence,

1    Your Honor, we believe the United States has more than proven

2    that the offense of conviction involved distribution.

3             THE COURT:  All right.  Anything further, Mr. Edgar?

4             MR. EDGAR:  Not from me, Your Honor.

5             THE COURT:  All right.  The Court recalls the

6    stipulated factual basis entered into by the parties.  Also,

7    the evidence that the Court has reviewed, the evidence

8    contained in the Sentencing Memorandum filed by the

9    Government, and certainly application note 6 of Section 2G2.1

10   regarding the defendant knowingly engaged in distribution if

11   he, A, knowingly committed the distribution or, B, aided

12   abetted, counseled, commanded, induced, procured, or willfully

13   caused the distribution, or, C, conspired to distribute.

14            As detailed in text messages conversations between

15   the defendant and his codefendant, Jamie Powell, referred to

16   at paragraphs 18 and 20 of the Presentence Report, the

17   defendant did aid, abet, counsel, and certainly commanded and

18   induced his codefendant, Ms. Powell, to produce and distribute

19   the sexual abuse material of Minor Victim 1.  So that

20   objection is overruled and that enhancement certainly applies.

21            All right.  Objection five to paragraphs 51 and 62.

22   Smith denies engaging in a pattern of sexual abuse.  File

23   number video, last four digits, 7725 does not depict child

24   sexual abuse.  Points under Section 4B1.(5)(b)(1) counted

25   twice in paragraph -- regarding paragraphs 51 and 62.

1          Do you wish to continue with that objection

2     Mr. Edgar?

3               THE DEFENDANT:  No.

4               THE COURT:  You wish to withdraw that?

5               THE DEFENDANT:  Yes, sir.

6               THE COURT:  All right.  We'll show that objection

7     withdrawn.

8          And I think that takes care of all the objections,

9     Mr. Edgar; is that correct?

10              MR. EDGAR:  I think so, Judge.

11              THE COURT:  And as I indicated earlier, the

12    Government did not have objections.

13         All right.  So based on your review of the

14    Presentence Report, Mr. Smith, do you find its contents to be

15    true and accurate?

16              THE DEFENDANT:  Yes, Your Honor.

17              THE COURT:  All right.  His codefendant, Jamie

18    Powell, entered a plea of guilty and Plea Agreement.  She was

19    found guilty on June 6 of 2024.  Sentencing is pending.

20         History of the charge contained in Part A.  On

21    October 4, 2022, a six-count indictment was filed naming the

22    defendant and codefendant, Jamie Powell.  Count 1 charges the

23    conspiracy to commit sexual exploitation of a minor.  Counts 2

24    through 4 charged defendant with and codefendant with sexual

25    exploitation of a minor and attempt committed between

1    December 2020 and on or about February of 2021.  Count 5

2    charges defendant with receipt of visual depictions of minors

3    engaged in sexually explicit conduct.  And Count 6 charged the

4    defendant with possession of visual depictions of minors

5    engaging in sexually explicit conduct.  There's also a

6    forfeiture allegation regarding computers, cell phones, and

7    other communication devices.

8         October 4, 2022, a warrant was issued for the

9    defendant's arrest.  On October 6, 2022, the Court issued a

10   writ commanding the presence of the defendant, who was

11   confined at that time at the Indiana Department of Correction,

12   commanding him to be presented before the District Court of

13   the Southern District of Indiana to answer the prosecution of

14   this case.

15        October 18, 2022, defendant appeared before the

16   Court, ordered detained.  On April 11, 2024, there was an

17   accept or reject hearing.  Defendant declined to plea offer at

18   that time.  On May 20, 2024, petition to enter a plea of

19   guilty and a request for preparation of Presentence Report was

20   filed.  Defendant agreed to plead to Count 1, the conspiracy.

21        June 3rd, 2024, a motion for preliminary order of

22   forfeiture was filed regarding the items, cellphones,

23   handwritten letters, other items listed in the Presentence

24   Report.  That motion was granted by the Court on June 5, 2024.

25   On June 6th, 2024, change of plea hearing was held.  At the

1  time -- at that time, Mr. Smith pled guilty to Count 1, signed

2  a stipulated factual basis for the plea.  Defendant was

3  adjudged guilty at that time.

4         August 26, 2024, petition to enter a plea of guilty

5  to Count 6 was filed.  January 8, 2025, the Court granted

6  defendant's -- granted the Government's motion to dismiss

7  Count 5.  On January 17, 2025, defendant pled guilty to

8  Count 6 of the indictment, possession of visual depictions of

9  minors engaged in sexually explicit conduct.  Stipulated

10 factual basis was filed with the Court.

11        Offense conduct is listed in paragraphs 15

12 through 30.  Parties indicating to the Court the information

13 contained in the Presentence Report is true and accurate, the

14 Court will adopt the findings of the probation officer

15 regarding the offense conduct as its own findings regarding

16 the nature and circumstances of the offense.

17        I'm not going to go through all of it, but just a

18 summary of what we have here.  Defendant and Jamie Powell,

19 known as Jamie Cramer, were residents of the Southern District

20 of Indiana.  Jamie Powell is the mother of five children,

21 including Minor Victim 1, who was born in May of 2019.  Minor

22 Witness No. 1, initials H.P., born in August of 2005.  Minor

23 Witness 2, initials E.P., born in 2017.  B.P., who was born in

24 2003, and A.P., who was born in 2004.

25        The defendant knew Minor Victim 1 was under the age

of 18 in 2020 and 2021.  In or around early 2020, the
Department of Child Services filed to terminate Jamie Powell's
parental rights.  Powell relocated to an apartment in
Anderson, Indiana, and resided with the defendant, Richard
Smith.  During this time period, Powell and Smith were in a
romantic relationship, resided together in Anderson between
late 2020 and approximately February 4, 2021.  Smith is not
the biological father of any of Powell's children.

Beginning in late 2020 and early 2021, Smith and
Powell began communicating in person and using their cell
phones regarding Smith's sexual interest in Powell's minor
children and bestiality.  During those text messages, Smith
and Powell agreed and conspired for Powell to employ, use,
persuade, induce, entice, and coerce a minor, Minor Victim 1,
to engage in sexually explicit conduct for the purpose of
producing any visual depiction of such conduct.

Defendant Smith knew that Powell was Minor Victim 1's
mother and that as such, she had physical access to Minor
Victim 1 during supervised visits while Minor Victim 1 was in
Indiana Department of Children Services custody.  Defendant
Smith knew that Minor Victim 1 was less than two years old
during the time she was sexually exploited.

For example, on or about January 31, 2021, the
following messages were exchanged between Smith and Powell
describing Smith's desire to sexually exploit Powell's

children, including Minor Victim 1, and Powell's desire to help.

I'm not going to recite the transcript of those calls, but the Court agrees and finds and certainly there appears to be no objection to this transcript that the defendant is requesting sexually explicit photos and video and codefendant Powell is agreeing to provide those to him.

In late 2020, early 2021, codefendant Powell was permitted to have supervised visitation with Minor Victim 1 and Minor Witness 2. The supervised visitation took place at a Court supervised facility in Muncie, Indiana. The supervised visits with Powell, Minor Victim 1 and Witness Victim 1, one of Powell's other children, were monitored by a DCS contract supervisor and were court ordered.

Between approximately December 2020 and approximately February 2021 and during Powell's court ordered visitation with Minor Victim 1 and Minor Witness 2 in Muncie, Indiana, Powell waited until the DCS contractor was not looking and intentionally produced numerous images and videos of Minor Victim 1. These images included, but were not limited to, the following, which were produced and saved onto Powell's Samsung A50 smartphone.

And these are file numbers, last four digits, 9029, which were previously referred to, and 7725. Also there's a file image, image number 17 as well.

1          Each of these videos and images constitute child sex

2    abuse material as they depicted Minor Victim 1 engaged in

3    sexually explicit conduct and sexual contact.  The defendant

4    conspired with Powell for Powell to produce the videos and

5    image described pursuant to their conspiratorial agreements as

6    charged in Count 1 among other images and videos and that

7    Powell distributed the videos and images as described above to

8    the defendant Smith.

9          Between on or about December 2020 and on or about

10   February 2021, defendant knowingly and unlawfully conspired

11   and agreed with Powell to employ, use, persuade, induce, and

12   entice and coerce Minor Victim 1, who was under the age of 18,

13   to engage in sexually explicit conduct for the purpose of

14   producing any visual depiction of such conduct, knowing and

15   having reason to know that such visual depiction would be

16   transported using any means and facility of interstate and

17   foreign commerce and effecting interstate and foreign commerce

18   certainly by cell phone.  These visual depiction were actually

19   transported and transmitted by means and facility of

20   interstate or foreign commerce.

21         Powell and Smith exchanged text messages, images, and

22   videos through internet connections and interstate wire

23   communications discussing the sexually exploitation of minors

24   and attempted sexual exploitation of minors, including Minor

25   Victim 1.  Powell produced and attempted to produce videos and

1    images of Minor Victim 1 that depicted sexually explicit

2    conduct as defined in 18 U.S. Code Section 2256 subsection 2.

3    And Powell transmitted those images and videos through

4    internet connections and wire communications to Smith.  The

5    images and videos that Smith and Powell conspired to produce

6    impacted interstate or foreign commerce and that -- and that

7    the cell phone Powell used was manufactured outside the State

8    of Indiana.  Defendant Smith further admits the Samsung Galaxy

9    Note 20 5G smartphone was manufactured outside the State of

10   Indiana.

11           As to Count 6, between on or about December 2020 and

12   on or about February 2021, defendant knowingly possessed

13   visual depictions that had been mailed, shipped, or

14   transported via interstate and foreign commerce by any means

15   including computer.  Production of visual depictions involve

16   the use of a minor engaged in sexually explicit conduct and

17   sexual contact.  Smith saved and possessed the images and

18   video files of child sex abuse material on his Samsung Galaxy

19   note 20 5G smartphone.  The material included a prepubescent

20   minor or a minor who had not attained the age of 12.  Smith's

21   smartphone was manufactured outside of Indiana.  And there are

22   many file names listed in the Presentence Investigation

23   Report, and there's been no objection to those file names, and

24   those files contain sexually explicit material involving

25   prepubescent minors or a minor who had not attained the age of

12.

On February 4, 2021, defendant was arrested on an outstanding warrant for a violation of probation and participation terms of the Henry County drug court. While he was incarcerated at the Indiana Department of Correction facility, his cell phone, a Samsung Galaxy Note 20 5G smartphone remained at codefendant Powell's residence. As a result, Powell and Smith began communicating via the inmate messaging application Global Tel Link or GTL on or about March 24, 2021.

On or about July 26, 2021, Indiana Department of Correction contacted the Indiana State Police regarding messages between Powell and Smith as to the potential endangerment or exploitation of Minor Victim 1. Detectives then obtained a search warrant and searched Powell's residence recovering numerous devices to include Powell's cell phone. Powell's cell phone was forensically examined and revealed images and videos she produced at Smith's direction of Minor Victim 1 at the Indiana DCS contracted facility. Powell was charged on April 25, 2022.

Later the United States received information regarding another Samsung cell phone attributed to Smith that was provided to Powell's children to use after his arrest. The Samsung Galaxy 5G smartphone was later recovered from Powell's son, B.P., on August 29, 2022, and was forensically

1    examined.  It revealed approximately 492 media files,

2    specifically images or videos, that were recovered in a second

3    encrypted folder of the same or similar child pornography

4    found on Powell's cell phone.  Specifically, the approximately

5    492 files depicted images and videos of sexually explicit

6    conduct involving Powell and Minor Victim 1 as well as

7    approximately 5,000 images of other child pornography and

8    bestiality.  Many of the media files were stored in a

9    subfolder of the secured encrypted folder named "incestuous

10   pedophile," the names of codefendant Powell and Minor

11   Victim 1.

12          Digital forensic examination also extracted

13   additional child sex abuse material on the Samsung A50

14   smartphone, particularly approximately 2,400 image files of

15   child pornography and approximately 170 files of bestiality.

16   The child pornography was recovered from the encrypted

17   partition feature in the Samsung devices known as a, quote,

18   secure folder unenabled by default.

19          Victim impact.  Of course, the victims of these

20   offenses are Minor Victim 1 in Count 1 and all the other

21   children that were portrayed in the images possessed by the

22   defendant as charged in Count 6.

23          On September 24, 2024, the Government advised the

24   National Center For Exploited Children, reports were received

25   reflecting a total of 971 total videos or images and 131 total

1   series were identified.  The victims have been notified;

2   however, no request for restitution or victim impact have been

3   received to date.  Restitution, of course, is mandatory and

4   that will be determined by the Court.

5        Adjustment for obstruction of justice.  There's no

6   information indicating defendant impeded or obstructed

7   justice.  As I indicated earlier, I find the defendant did

8   accept responsibility in Count 1 and Count 6.  The Court finds

9   that two levels shall be reduced regarding that acceptance.

10  The Government will not make a motion regarding 3E1.1(b).

11       Offense level computation.  The 2024 manual was used.

12  Because the incidents involved separate harms to separate

13  victims, the charges in Counts 1 and 6 are not grouped.

14  Count 1, sexual exploitation of a minor and attempt regarding

15  Minor Victim 1.  Base offense level is 32.  Specific offense

16  characteristic one, the offense involved a minor who had not

17  attained the age of 12.  Specifically, she was 18 months.

18  Four levels are added.

19       Specific offense characteristic two.  The offense

20  involved the commission of a sexual act.  Two levels are

21  added.

22       Specific offense characteristic three.  Defendant

23  knowingly engaged in distribution.  Two levels are added.

24       Specific offense characteristic four.  Defendant

25  knowingly possessed material that portrayed a sadistic or

 1    masochistic conduct or other depictions of violence or an

 2    infant or toddler.  Four levels are added.

 3            Victim related adjustments.  There are none.  No

 4    other adjustments.  A subtotal of 44.

 5            As to Count 6, possession of visual depictions of

 6    minors engaged in sexually explicit conduct.  Base offense

 7    level is 18.  Specific offense characteristic one, the offense

 8    involved material that portrays a prepubescent minor or a

 9    minor who had not attained the age of 12.  Two levels are

10    added.

11            Specific offense characteristic two.  The offense

12    involved material that portrays sexual abuse or the

13    exploitation of an infant or a toddler.  Four levels are

14    added.

15            Specific offense characteristic three.  The defendant

16    engaged in a pattern of activity involving the sexual abuse or

17    exploitation of a minor.  Pursuant to the guidelines, five

18    levels are added.

19            Specific offense characteristic four, the offense

20    involved the use of a computer or interactive computer and

21    service for the possession, transmission, receipt, or

22    distribution of material.  Two levels are added.  However, I

23    think as counsel knows, my practice and thoughts on this

24    specific offense characteristic -- today all these offenses

25    are committed by computer, and so the Court will not assess

1   this specific offense characteristic.

2           Specific offense characteristic five.  The offense

3   involved more than 600 images or videos.  Five levels are

4   added.  No other adjustments.  We have a subtotal of 34.

5   Multiple count adjustments.  Units are assigned pursuant to

6   3D1.4(a)(b) and (c).  We have Count 1.  Adjusted offense level

7   is 44.  Assigned one unit.  Count 6, adjusted offense level is

8   34.  Assigned .5 units.  Total number of units 1.5.  The

9   greater of the adjusted offense levels is 44.  Increase the

10  offense level pursuant to 3D1.4, we had one.  Combined

11  adjusted offense level is 45.

12          Chapter 4 Enhancements.  The offense of conviction is

13  a covered sex crime.  Neither 4B1.1, the career offender, nor

14  Subsection A of 4B1.5 applies and the defendant engaged in a

15  pattern of activity involving prohibited sexual conduct;

16  therefore, the defendant is a repeat and dangerous sex

17  offender against minors.  The offense level shall be five plus

18  the offense level determined in Chapters 2 and 3, so we now

19  have an applicable offense level of 50.  As I indicated

20  earlier, acceptance of responsibility, we'll subtract two

21  levels.  Total offense level is 48.  However, pursuant to

22  Chapter 5, Part A, the comment at Note 2, there are rare

23  instances where the total offense level as calculated in

24  excess of 43, and, therefore, the offense level will be

25  treated as a Level 43.

1              Defendant's criminal history.  I find no juvenile

2    referrals.  Adult criminal convictions begin with arrest in

3    2004.  Theft, a felony, in Marion County, Indiana.  Pursuant

4    to 4A1.2(e)(3), zero criminal history points assessed.

5    September of 2005, age 23, residential entry in Marion County,

6    Indiana, zero criminal history points assessed.  November 10,

7    2008, obstruction of justice, a felony, Marion County,

8    Indiana.  Zero criminal history points assessed.  October 15,

9    2013, dealing in methamphetamine, an amount 13 grams or more,

10   a felony, in Henry Circuit Court.  June of 2014, received

11   16 years at the Indiana Department of Correction, six years

12   suspended, two years formal probation.  Pursuant to 4A1.1(3),

13   three criminal history points are assessed.  Defendant was

14   released from IDOC to probation in 2015, placed on drug court

15   program in 2018.  2021, his drug court was terminated,

16   probation revoked, sentenced to 3,958 days Department of

17   Correction.  July of 2018, charged with possession of

18   methamphetamine, a felony, in Henry County Circuit Court.

19   March 4, 2021, received five years Department of Correction,

20   consecutive to another cause number, fine and costs.  Pursuant

21   4A1.1(a), three criminal history points assessed.  February of

22   2021, battery with bodily injury to a public safety officer, a

23   felony, in the Henry Circuit Court.  August 5, 2021, received

24   four years Indiana Department of Correction consecutive to

25   other cause numbers.  Pursuant to 4A1.1(a), three criminal

1  history points are assessed.

2          Criminal convictions result in a subtotal criminal

3  history score of nine.  Defendant was under a criminal justice

4  sentence of probation for that conviction and sentence

5  referred to in paragraph 70 of the Presentence Report at the

6  time of the instant offense; therefore, one criminal history

7  point is added.  Total criminal history score is ten, placing

8  him in Category V.  No other criminal conduct.  No pending

9  charges.  Other arrests back in 2018 for auto theft, those

10  charges were dismissed.

11          Background.  Defendant was born in California in

12  1982, his father, Derek Smith, and mother, Lois Smith.

13  However, defendant was primarily raised by his paternal

14  step-grandmother, Deborah Stewart, age 72 now.  When defendant

15  was a child, step-grandmother maintained employment with a

16  company in California.  Dedicated her time to caring for the

17  handicapped and mentally ill until retirement.  She now

18  resides in Indiana.  Defendant indicates he and his

19  step-grandmother share a phenomenal relationship and

20  communicate daily.

21          Defendant does have a lengthy criminal history -- or

22  excuse me, defendant's father has a very lengthy criminal

23  history, was in and out of prison for most of defendant's

24  life.  Father now resides in Indiana and is disabled.  Does

25  not have any information regarding his mother.  Last

1    communicated with his mother nine years ago.  Defendant

2    indicates his mother and father both battled long-term drug

3    addictions.

4         Defendant has maternal half siblings, Charlos Knight

5    and Desirae Smith.  Desiree is now deceased.  Also have 12

6    paternal half siblings from with whom he does not share a

7    close relationship.

8         Defendant describes a solemn childhood history of

9    abuse and abandonment.  Very few positive memories of his

10   childhood.  Recounted being physically abused by his mother

11   beginning at age four or five and molested by his mother's

12   best friend and her husband.  Molested by his maternal uncle.

13   Indicates he further comes from a long line of drug addicts.

14   When he was nine years old, his paternal grandmother was

15   reportedly murdered while at a bar, killed over, quote,

16   alcohol and men.  Maternal grandmother murdered by teenagers

17   when the defendant was 11.

18        Despite his basic needs being met, he lived in a,

19   quote, really tough neighborhood.  Mr. Smith indicates he felt

20   invisible at home.  He -- it was his grandmother, his

21   grandfather's wife, who primarily cared for him.  Defendant

22   reportedly ran away from his grandparents' house approximately

23   30 times, sleep outside, obtain food from trash cans.

24   Eventually began selling and using drugs.

25        Defendant met and later married April Beaver in

1    Marion County, Indiana, when he was approximately 20.  They

2    have a daughter, age 20.  Defendant has not had contact with

3    his daughter since her first birthday.  Defendant and his wife

4    are now divorced.  His daughter was eventually adopted by her

5    stepdad, and she and the defendant are estranged.

6         Defendant and Nicole Ostertag had a 17-year off and

7    on relationship.  They share one child, age 13.  Resides with

8    his mother in New Castle.

9         Defendant and codefendant, Jamie Powell, reportedly

10   engaged in an off and on casual sexual relationship for

11   16 years.  Defendant resided in California until age 16.

12   Thereafter went to Liberty, Indiana, for approximately six

13   months.

14        Had a rebellious teenage behavior.  Grandmother sent

15   him back to California to live with his grandfather.  Stayed

16   until age 18.  Returned to Indiana.  Imprisoned at Indiana

17   Youth Center for approximately two and a half years.

18        Defendant's physical condition.  He indicates he

19   doesn't have any significant physical ailments.  He was

20   diagnosed with asthma at birth.  When asked to describe his

21   current physical health, he stated he is obese; otherwise,

22   reports no health concerns.

23        Mental and emotional health.  Reportedly diagnosed

24   with post traumatic stress disorder sometime prior to his

25   arrest in New Castle, Indiana.  Denied suffering any

1  additional mental health issues but shared he has had four

2  prior suicide attempts over the years.

3      Court records reflect on November 9, 2005, he was

4  ordered to complete 26 weeks of domestic violence counseling

5  as a condition of probation.  He also completed the Bridges to

6  Life Victim Impact class while in prison at the Department of

7  Correction.  Prior IDOC status report reflects defendant was

8  classified as, quote, free of mental illness while imprisoned

9  at the Plainfield Correctional Facility; however, in 2014, he

10  completed dual diagnosis program at the department.  He has no

11  known prior diagnoses.

12      Substance abuse.  He has an extensive history of

13  substance abuse.  First tried marijuana at age eight.  Did not

14  use the substance again until age nine.  Also began consuming

15  alcohol with neighborhood buddies.  Last consumed alcohol in

16  2021.  He drank daily prior to that.

17      First snorted cocaine at age 11.  Last snorted

18  sometime in 2020.  Used the substance at least three times a

19  week.  At age 13, he first used methamphetamine.  It was easy

20  to obtain because his mom's friends had become like family.

21  Last use of methamphetamine was on February 2 of 2021.  Used

22  the drug daily prior to that date of last use.

23      First used crack cocaine at age 19.  Few times used

24  the drug.  Subsequent to that, he began abusing prescription

25  opiates, Percocet, Vicodin.  Defendant stated he was, quote,

1   really big on Xanax for three consecutive years.  Stopped

2   using for a long time but relapsed prior to his arrest for

3   this offense.  Stated one time use of heroin at age 38.  Also

4   used K2 spice regularly.

5        He has attended Marion County Addiction to Recovery

6   Center, inpatient treatment program, also began attending

7   intensive outpatient treatment at Meridian Services followed

8   by Relap Prevention.  He's currently receptive to

9   participation in substance abuse treatment.

10       Education.  He completed the 10th grade of high

11  school in New Castle, went to the Job Corps at age 16.  He was

12  taught plumbing by a master plumber.  He expressed interest in

13  exploring vocational training programs in the building trades

14  while housed at the Bureau of Prisons.  He denies any

15  enlistment in the military.  At the IDOC, he completed the

16  LLS2 program.  Also, he indicates he obtained his GED in 2017.

17       Employment history.  He has a brief employment

18  history.  He worked at a foundry, other factory work in

19  Anderson, Indiana.  Also worked at fast food restaurants and

20  remodeled bathrooms as well.

21       Financial condition.  He has no monthly income or

22  expenditures, denies having any assets.  Does not have the

23  ability to pay a fine within the guideline range.

24       Sentencing options.  Under the statute, the minimum

25  term of imprisonment is 15 years.  Maximum term is 30 years in

1   prison.  Count 6.  The maximum term of imprisonment is

2   20 years.  Guidelines.  Based on total offense level of 43 and

3   a criminal history category of V, the guideline imprisonment

4   range is life.  Because each count has a fixed statutory

5   maximum term of imprisonment, as to Count 1, that's

6   360 months, as to Count 2, that's 240 months, the advisory

7   guideline range cannot be life.  Therefore, the guideline

8   range becomes 600 months or 50 years.

9         Supervised release.  Under the statute, Counts 1 and

10   6, five years to life per count.  Under the guidelines, five

11   years to life per count.  He is ineligible for probation under

12   the guidelines and under the statute.

13         Paragraphs 122 and 123 recite the mandatory and

14   proposed conditions of supervision.  And, Mr. Smith, have you

15   been able to read and discuss with your attorney the mandatory

16   and proposed conditions of supervision?

17         THE DEFENDANT:  Yes, we talked about that.

18         THE COURT:  Do you have any objection to those

19   conditions?

20         THE DEFENDANT:  No, sir.

21         THE COURT:  Mr. Edgar, did you see any of those

22   conditions that would generate an objection or cause any

23   concern?

24         MR. EDGAR:  No, Your Honor.

25         THE COURT:  Paragraph 124.  Fines under the statute,

 1    Count 1 and 6, maximum fine is $250,000 per count.  There's a

 2    mandatory special assessment fee of $100 per count for a total

 3    of $200.  Defendant is also subject to the provisions of the

 4    Justice For Victims of Trafficking Act.  However, he is

 5    indigent.  He's also subject to provisions of the Amy, Vicky,

 6    and Andy Child Pornography Victim Assistance Act of 2018.

 7    Guideline provisions, fine range is 50,000 to $500,000.

 8    Restitution, under the statute and under the guidelines, of

 9    course, is mandatory and shall be ordered.

10          As I indicated earlier, no objections from the

11    Government, and we've taken care and addressed the objections

12    filed by the defendant, several of which were withdrawn.

13          Mr. Smith, those are the findings of the Court based

14    on the information contained in the Presentence Investigation

15    Report.  Do you have any questions, comments, or concerns

16    regarding the Court's findings based on that information

17    contained in the Presentence Report?

18          THE DEFENDANT:  No, Your Honor.

19          THE COURT:  At this stage of the proceeding,

20    Mr. Smith, you have a right and an opportunity to make any

21    comment to the Court you wish regarding the issue of the

22    appropriate sentence, or for that matter, anything you wish to

23    discuss.  You can also present evidence in support of those

24    comments, and, of course, you can have your attorney speak on

25    your behalf as well, and the Government has that same right

1    and opportunity to make a comment regarding the appropriate

2    sentence and present evidence in support of those comments.

3    Do you understand all this?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  All right.  Mr. Edgar, any presentation

6    here today?

7              MR. EDGAR:  I do have a presentation, Judge, but I

8    think it might work best if Mr. Smith goes first.

9              THE COURT:  Okay.  Mr. Smith, do you have a statement

10   you wish to make?

11             THE DEFENDANT:  Before I read this -- I wrote this

12   about -- probably about 26 months ago.  There's nothing that I

13   can say that's excusable for anything that I've done or

14   anything that I've said.  I've made myself look like a

15   monster, and that's -- that's probably the best look for me,

16   but I still would like to read this.  Like I said, no matter

17   what I say, nothing is ever going to take away the pain that

18   I've caused this family or this child.

19             As I read this aloud, I stand here before all of you

20   regretful, ashamed, and appalled by my aberrant choices.  I'm

21   beyond disgusted by my depraved, detestable, and perverse

22   actions.  If only death could show how sorry I truly am for

23   these vile and abominable actions, I'd willingly give up life.

24   I only wish the words "I'm sorry" and "please forgive me" were

25   enough.  I only know too well that these words can never

1    express how truly sorry I am.  I desperately need the

2    forgiveness of the little girl in this case, the family of

3    this child, the court in which I'm standing, my family, and

4    everyone else I've hurt.  I pray day and night for divine

5    healing for anyone I have affected in all of this.  I don't

6    ask for forgiveness because I want to get out of this trouble

7    I'm in.  I ask it because I don't want hurt or anger to

8    control someone else's life like it has mine.  Unlike me, I

9    hope and pray that the child in this case never has to know or

10   remember there was a monster on the other end of a phone.

11        When I first got incarcerated on this case, I was in

12   denial.  All I wanted to do is point the -- point a finger and

13   play a blame game, but in my heart and soul, I knew the child

14   in this case deserved my accountability.  I was wrong, and I

15   know I deserve punishment.

16        At one point I mentally refused to write an apology

17   letter, not because I wasn't sorry or ashamed of myself, but

18   because -- well, actually, because of two things.  One, the

19   entire time I was living with my codefendant in Anderson,

20   Indiana, I was high.  And I'm not using that as an excuse.

21   It's just the truth of it.  I really don't remember much of

22   anything that was said or written.  Not an excuse because I'm

23   the one who decided to start using again.  And the second

24   reason is because, to me, an apology is something that comes

25   from the heart, not something that is written from a pen.

1    Just a few words didn't seem adequate enough, but after seeing

2    some of the stuff I wrote, my whole perspective changed.  My

3    mind and heart were flooded with emotions I still am unable to

4    comprehend.  In that moment, while reading the grotesque

5    things that I had written, I not only thought I was a

6    disgusting, vile person, but I knew I was and so much more

7    than that, less than a person, a nothing, a loser of the worst

8    kind.  A monster and a coward befits me very well.

9        I'm more than sorry for the pain an embarrassment

10   I've caused.  There isn't a moment that goes by that I don't

11   regret any of this, even if it's only cost me my heart, soul,

12   and life, it's a price worth paying.  This is why it was

13   imperative for me to write this apology letter because

14   standing up with no more than an "I'm sorry" and "please

15   forgive me" just wasn't sufficient or sincere enough in my

16   eyes.  I don't deserve anyone in this case's forgiveness, but

17   I'm begging for it.  Please.  All I ask is for forgiveness.

18       Thank you for your time and for listening to this

19   letter.  I pray that God also forgives me and watches over and

20   blesses all of you.  Nothing can take away what I've done.

21   I've ruined my character.  I've ruined standing relationships

22   with my dad, my grandmother.  I haven't talked to my son in

23   two and a half years, and I deserve it.  Like I said, it's not

24   going to take away the pain, but I hope the child doesn't have

25   to grow up like I did, afraid and not trusting, because she

1    deserves better than that, but thank you for your time, Your

2    Honor.

3              THE COURT:  Thank you, Mr. Smith.  Mr. Edgar?

4              MR. EDGAR:  May I have just a moment to plug in here?

5              THE COURT:  You may.

6              MR. EDGAR:  Do I need to be made live here?  There we

7    go.

8              Mr. Smith speaks well on his own behalf, so I don't

9    need to belabor a lot of the points that he's made.  I've also

10   filed a Sentencing Memorandum trying to highlight some of the

11   better parts of his character, and I won't belabor those

12   points.

13             What I would hope to illustrate today, Your Honor, at

14   the risk -- I want to provide some context.  At the risk of

15   being repetitive or obvious to some or abrasive to others, I

16   hope the Court and the parties and the observers will indulge

17   me, but one I thing I can say with certainty about Mr. Smith

18   is, from the start, he was programmed to accept responsibility

19   for this.  We know that because he went and did the proffer.

20   The proffer went well.  There is a part of his character mixed

21   into all the horrible parts of his character in that gray area

22   that I suspect exists in all of us that makes criminal

23   behavior seem perhaps reasonable under some circumstances.

24   Buried and mixed into all of that bad character is this

25   concept of I'm accepting responsibility, but I think things

1    should be correct and true.  And honestly, that's some of the

2    times where he -- where I get frustrated with him because in

3    my mind, as the lawyer, maybe a little jaded, I say, it's not

4    going to affect the bottom line.  Why are you fighting over

5    that?  I mean, that's what I'm thinking.  I don't tell him

6    those words but -- because it's his case.  I should trust him.

7    So we end up -- with the perception that we're fighting over

8    things that ultimately don't move the dial even a little bit,

9    and it may look like it's an attempt to dodge or evade or

10   manipulate or plead to this so he can cap his exposure at this

11   and so forth.  I think that's a fair reading.  It's a fair

12   argument.  I know the Government is going to make that

13   argument.  It's logical.  This is what I see from Mr. Smith,

14   is he says -- you know, when he describes that video image of

15   not actually displaying sexual activity, you hear from the

16   witness, that's probably a reasonable perception on his part.

17   And that's why he dug his heels on it, even though it didn't

18   affect the outcome at all.  None of our arguments affected the

19   outcome because he's at the top of the guidelines.  We

20   appreciate the Court's patience.

21           THE COURT:  You explained that to him.  His guideline

22   was so high, that even if all the enhancements were taken

23   away, he'd still be at Level 43 pretty much?

24           MR. EDGAR:  Right, right.  It's all been academic,

25   but that's important to him.

 1            THE COURT:  Yeah.  Absolutely.

 2            MR. EDGAR:  It's his case.  I've learned to respect

 3   that.  So one of the things today that I did learn -- I

 4   started as a young deputy prosecutor, and I was assigned to

 5   some cases where children were victims, and the pattern became

 6   obvious later on down the line as those children ended up in

 7   the system as defendants because even though I made the

 8   effort, they were frequently sent right back into the

 9   environment that they came from, the environment that abused

10   them, the environment that created their -- the challenges and

11   the harder parts of their character, and there's very little

12   help for children like that.  And Mr. Smith, even though he's

13   a grown man and can be stubborn and abrasive and, you know,

14   has -- he's here, you know, exposed warts and all.  He was

15   that child, and it's my job to try and point that out, that

16   that is a factor that determined the trajectory of his life.

17   It's very, very difficult to alter that trajectory.  And the

18   flip side of that argument is, well, then he should know what

19   he's doing when he victimizes children, but we know from

20   experience that doesn't hold true for everybody.  Some people

21   simply cannot escape that victimization, especially when the

22   system is not really designed or programmed, especially on the

23   state level, to fully address those issues like a federal

24   penitentiary might be with a sexual offender management

25   program, high quality counseling, and evaluations.  So that's

 1    one -- one pattern that I think -- one bit of context that I

 2    think is very important.

 3             After being lucky enough to get on the panel sometime

 4    around -- the CJA counsel panel sometime around 2005, I was

 5    new to the system.  I didn't understand it, and I kept getting

 6    crushed at sentencing because these guideline scores kept

 7    coming back like a ratchet effect, upward, upward, upward, and

 8    I'm embarrassed to admit that it took me several years to

 9    recognize this pattern.

10             THE COURT:  Certainly not uncommon.

11             MR. EDGAR:  Right.  Because I was used to state court

12    where it was more of a -- you know, a lot more discretion for

13    the judge, especially back then when everything was mandatory.

14             So around 2010, 2011, I was asked to do a CLF for

15    federal offenders, and I chose the topic of the United States

16    Guidelines Sentencing Commission because I wanted to figure

17    this out.  Because what I was finding when I go on the

18    internet -- I cite this in my briefs regularly, but I think it

19    helps to actually see it.  This is the National Institute of

20    Justice, which is a department of the same DOJ that comes to,

21    you know, represent the United States, and they agree with me

22    that these monster sentences, these terrifying sentences do

23    not deter crime.  It's simply a fact.  It's right here in

24    plain English, still today available on their website, that

25    what deters people is the certainty of getting caught.

 1          So you can make the sentence -- we can make the

 2     sentence as long as you want, but it's not going to deter

 3     Mr. Smith, and it's not going to deter anybody who hears about

 4     Mr. Smith.  So this is a fallacy that somehow creeps into this

 5     process is somehow a truth, even though there's no evidence

 6     that I've ever seen that lengthy sentences actually deter

 7     crime.

 8          So then we go to the -- the history of the guidelines

 9     commission, and this is, you know, me risking pointing out the

10     obvious, but it came into being in the '80s during the Reagan

11     era, and was sort of during that -- that time of the very

12     beginning of the war on drugs.  We used terms of phraseology

13     related to war.  So war on drugs.  The war on crime.

14          So we create this Sentencing Guideline Commission.

15     It is presidential appointments, and so we have -- they're the

16     ones who essentially set the standard starting out under the

17     Reagan era.  Then we have George Bush, the first, and then we

18     have the Clinton era in the '90s where, even though there was

19     a shift in politics and sort of the political party structure,

20     the dominant party structure, there's still this war on crime

21     concept.  I mean, I was there in the '90s.  I was lawyering in

22     the '90s.  We all bought into the fact that long sentences

23     were going to cure this problem, and now we know that's not

24     true.

25          So for the first 15, 20 years, and then we have

George W. Bush, we have this appointee sort of environment for

the guidelines where the history, the tradition, the culture

is let's continue with this ratcheting upwards, ratchet up,

ratchet up.  You know this is a problem, Your Honor, because

any sentencing scheme, any sentencing guidelines that doesn't

-- that very specifically and, quote, unquote, scientifically

assigns points ratcheting upward for certain behavior but is

incapable of assigning points ratcheting downward for

mitigating behavior is problematic.  That can't be a just

sentencing system.  It cannot be.

        The evidence of this is the guidelines recognizes

mitigators.  There's like 25 of them.  But none of them come

with points.  And I think that's a problem.  Childhood trauma,

behavior driven by drug addiction.  They know that these are

factors.  These are mitigators, but no points.  Why can't we

assign points to that?  Four points off for being abused

sexually as a child.  Would that be so foreign a concept?

        So I did this presentation.  I hope you'll forgive me

for going through it, but this was a snapshot of the

guidelines commission at the time.  So meet your United States

sentencing commission.  This was done in 2011, and I've

updated it for the second half.  It was also called "Who Let

the Fox Guard the Henhouse."

        Back then, eight members.  The first was Judge Patti

Saris, former chief AUSA, vice chair, retired career AUSA.

1   Judge Howell, former award winning AUSA.  Dabney Friedrich,

2   former AUSA.  Isaac Fulwood, retired police chief with

3   29 years on the force.  Jonathan Wroblewski, current director

4   of policy, Attorney General, DOJ employee -- an active DOJ

5   employee at the time.  Judge Ricardo Hinojosa, career judge

6   from Texas, described as unknown, but he was from Texas.  We

7   had Supreme Court Justice Kentanji Brown Jackson before she

8   was so famous, and she was the only one of all of the members

9   who would admit to having ever represented a criminal

10  defendant.  And when you look at someone's bio, that's what

11  they're proud of.  That's what they're proud of the most.  So

12  no one else has that in their bio except for her.

13          So the final tally back there was Government six,

14  defendant one.  Of course, we're not going to get any reform

15  under an environment like that, and one unknown from Texas.

16  Currently, we have Carlton Reeves, who's a judge.  He's former

17  U.S. attorney, chief of the civil division.  No mention of

18  defense practice.  Judge Felipe Restrepo.  He's a former

19  assistant federal defender, so there's some -- some movement

20  there.  And Laura Mate, who is the director of the Sentencing

21  Resource Council for the Federal Public and Community

22  Defenders.  So we have two people who seem to understand the

23  defense side of things.  Claire Murray.  Her -- highlights of

24  her career are all related to the Attorney General, including

25  participating in their honors program.  Candice Wong, senior

 1    leadership positions for the United States Department of

 2    Justice.  She's been there many years, and she's occupied

 3    leadership roles.  Patricia Kushwaha.  She's a career parole

 4    commission.  And Scott A.C. Meisler is a current employee of

 5    the Attorney General, deputy chief.  And so today's tally is 5

 6    to 2.

 7            So this is my hope, to provide some context as to why

 8    when a client panics and freaks out and starts to distrust the

 9    system and say, maybe I should go to trial.  What's the

10    difference?  They say things like, well, what's -- if my

11    parachute fails to open at 30,000 feet versus 10,000 feet,

12    what's the difference?  This is a phrase that resonates with

13    them.  If we can't possibly ever win under these guidelines,

14    what is the point?

15            And, honestly, Judge, it all comes down to the

16    judicial officer to be the balance on the system.  We've had

17    some reform over the last few years, but we still don't have

18    point values assigned for mitigators.  Very rarely.  You get

19    points for capitulating -- for capitulating fully to the

20    Government's offer, quote, unquote, but it all comes down to

21    the to judge.

22            I'm not saying that Mr. Smith somehow should be

23    perceived as deserving of a break.  That's not an -- that's

24    not an argument that I'm making.  He's done some horrible

25    things.  He has some deep rooted problems, but to say, well,

1    the trust -- the guidelines are somehow trustworthy or a good

2    guide for us, I do take issue with that, and I mean that

3    respectfully to the system.  I never mean to sound snarky or

4    disrespectful.  But I think that this is -- this is a

5    situation where it illustrates very clearly that all the

6    points that could possibly be piled on for an offense get

7    piled on as the Court has indicated.  The use of a computer?

8    I mean, that's baked in.  I think a lot of points that are --

9              THE COURT:  Well, I didn't apply that, right?

10             MR. EDGAR:  Correct.  Right, right, right.  So

11   clearly I'm stating something that the Court already has taken

12   into account.  But I do think a lot of this sort of

13   launching -- launching a defendant in a case like this up to

14   the top of the guidelines, these are all points that -- or

15   many of them are just inherent in the behavior of looking at

16   child pornography or seeking to produce it.  I think it's all

17   sort of connected.  Very unusual to find a case where they

18   only did it once.  You do it twice, it's a pattern.  And then

19   it's counted in multiple places, five points each.  I don't

20   think that that's a system that is -- that I can explain to my

21   client as fair.  I just can't.

22             The phrase that I use -- and you'll forgive me --

23   when I introduce the guidelines to my clients, I say you're

24   not going to like this because these are rules written by

25   prosecutors for prosecutors.  I know people in this room will

 1  disagree with me on that, but that's my perspective based on

 2  what I've -- the research that I've done, and it's my client's

 3  perspective.  So I don't think that the guidelines are really

 4  an effective tool for us today, Judge.  I don't -- I don't

 5  remember the last time I offered a number for a sentence,

 6  especially on a case like this, so I won't do that today, but

 7  I would ask you to consider that Mr. Smith has offered what

 8  appears to be a very sincere and well considered description

 9  of his remorse.  Thank you.

10          THE COURT:  Thank you, Mr. Edgar.  Ms. Preston, on

11  behalf of the Government?

12          MS. PRESTON:  Yes, Your Honor.  Would Your Honor like

13  me to present first or would Your Honor like to hear the

14  victim impact statement from the adopted parents?

15          THE COURT:  Victim impact statement probably would be

16  best.

17          MS. PRESTON:  And for the record, this is Minor

18  Victim 1's adoptive parents.  I'm going to ask that he not

19  introduce himself by his last name so we can keep that off of

20  the record in public space.

21          THE COURT:  Okay.  That's fine.

22          SPEAKER:  Good afternoon, Your Honor.

23          THE COURT:  Good afternoon.

24          SPEAKER:  Before I deliver our statement, there's a

25  couple things that I would like to address, if possible.  Your

1    Honor, if you would find it appropriate, we would like to give

2    you a photo to look at in reference while I deliver our

3    statement today.  I told Ms. Preston long before we came in

4    here today, you have seen our daughter in a very unfavorable

5    light, and we would like for you to be able to see her the way

6    that we see her.  So would you find that appropriate if I gave

7    you something to look at to reference?

8              THE COURT:  That's fine.

9              SPEAKER:  Thank you, Your Honor.

10             I would also like to explain something that stuck out

11   to me while we prepared our statement and that is how we

12   refer --

13             THE COURT:  How old is your daughter now?

14             SPEAKER:  She's five.  And that is how we reference

15   our daughter in our statement.  Our daughter has a name.  It's

16   a beautiful name.  It's part of who she is.  It's a part of

17   her story, and as much as I would like to use her name in this

18   statement, the defendant in this case has not earned the right

19   to ever hear our daughter's name.  So with that being said,

20   I'm going to simply refer to her as our daughter.

21             So, Your Honor, we are here today to share how the

22   defendant's actions have deeply affected our daughter, our

23   family, and our daily lives.  No words can fully express the

24   pain and fear that we carry every day, but we hope to help you

25   understand the lasting damage the defendant has caused on our

1    family.  As our daughter's parents, we face an unimaginable

2    reality that we must prepare ourselves for the difficult

3    questions that she will ask as she grows older.  One day

4    she'll want to understand what happened to her.  She'll want

5    to know her story, and we will be left to navigate the

6    emotional and psychological toll that this will have on her

7    life.  No parent should ever have to carry that burden.  No

8    child should ever have to know that this is part of their

9    story, and, yet, because of the actions of the defendant, it

10   is a reality that we cannot escape.

11        The defendant has stolen the innocence of childhood,

12   not just for our daughter, but for us as parents and us as a

13   family.  She is now to the age where she wants to do things

14   that every child should be able to do.  She wants to have

15   sleepovers with her friends.  She wants to be able to play

16   outside on her own, even things like set up a lemonade stand

17   in our neighborhood.  These are simple joys that every child

18   should be able to experience without fear and every parent

19   should be excited to experience with their child, but because

20   of the actions of the defendant, we cannot allow our daughter

21   these simple joys of childhood.

22        We are constantly on guard questioning everyone

23   around us and making decisions, not out of trust, but out of

24   fear.  Even everyday moments that should be filled with love

25   and laughter have become reminders of the harm that's been

1   caused.  Something as simple as painting our daughter's

2   toenails has become difficult because her feet were such a

3   focus of the exploitation caused against her.  I even struggle

4   calling our daughter "princess," a term that was once

5   affectionate, but is now tainted by how the defendant referred

6   to her.  The small precious parts of her childhood have been

7   stolen from us by the actions of the defendant.

8         The anxiety that we live with is constant and

9   overwhelming.  When we take our daughter to a park or museum,

10   most parents would feel comfortable giving their children a

11   little bit of independence, but if our daughter is out of our

12   sight even for a moment, we are overcome with panic, afraid

13   that someone might take her or harm her, and that fear is not

14   irrational.  It is a direct result of the defendant's actions

15   and the trauma that he's inflicted on our family.

16         And outside of today, the defendant has shown zero

17   remorse for his actions that have caused so much harm to an

18   innocent child.  The only time he's acted remorseful is when

19   he didn't want others to hear the evidence against him or to

20   have his messages read out loud, and while he may have the

21   privilege to ask others not to hear those messages, we don't

22   have the privilege of ever forgetting them.  We live with the

23   weight of those words and the reality of his actions every

24   single day.  And throughout this process, in my opinion, the

25   defendant has made a mockery of this court.  He's played games

1   claiming he would plead guilty only to change his mind.  He's

2   wasted Government resources and valuable time preparing for

3   trial only to once again reverse course.  His actions show

4   that he only cares for himself.  And, again, outside of today

5   at no point has he considered the profound and lasting harm

6   that he has inflicted on our daughter and on our family.

7        But despite everything she's endured and despite the

8   innocence the defendant tried to steal from her, our daughter

9   has blossomed into a funny, kind, and loving human, and we are

10  committed to raising our daughter to know and never question

11  that she is chosen, cherished, and deeply loved.  And every

12  single day we thank God for his protection over her, and we

13  vow as her parents to always protect her.

14       The defendant tried to take something from her, but

15  he did not succeed in taking her spirit or her future.  Your

16  Honor, the emotional way that this crime will never leave us.

17  There is no sentence long enough to undue the damage or to

18  make us feel safe again.  And while the defendant may one day

19  finish his sentence, we will continue to live with the result

20  of his actions for the rest of our lives.  If it were

21  possible, we would ask for a life sentence because we have

22  been given one.

23       So, Your Honor, we ask the Court to recognize the

24  profound and permanent damage that this crime has caused, and

25  we urge you to impose the maximum possible sentence, not just

 1    as a punishment for the defendant but as a measure of justice

 2    for our daughter and the life she deserves.

 3          Thank you for the opportunity.

 4          THE COURT:  Thank you.

 5          MS. PRESTON:  Thank you, Your Honor.  Your Honor, it

 6    is the position as set forth in our lengthy brief that a

 7    sentence of 600 months imprisonment, which is a guideline

 8    sentence, is sufficient but not greater than necessary to

 9    achieve the purposes set forth in the statute.  And, of

10    course, Mr. Edgar and I have had many discussions about the

11    guidelines.  We've had -- not just in this case, but in other

12    cases.  I think very critically about the guidelines and how

13    they apply to each individual case.  I just want to say in

14    response to his argument that there are -- there are reasons

15    why the guidelines and the enhancements in this particular

16    crime exist.  They are randomized.  So it's not inherent in

17    the behavior.  As you know, Your Honor, I prosecute many

18    crimes against children, and it does matter in this case that

19    this child was only 18 months old.  That enhancement matters

20    and should count because it increases the harm.  It does

21    matter that a sex act was involved because not every crime --

22    a sexual exploitation crime against a child includes a sex

23    act.  It did here, and that matters because it increases the

24    harm.  And it does matter that there was a pattern because

25    that is 577 times she was exploited instead of one, and so it

1    matters.  The pattern of activity matters.  And so he has

2    earned those enhancements.  And I'll say that, of course,

3    although, I agree with Mr. Edgar that there aren't points in

4    subtraction necessarily the ones that he was speaking of, but

5    that's where 3553(a) comes in, and, of course, Your Honor

6    considers those matters in mitigation and so do I.

7         So I'll turn to those factors, 3553(a), because it is

8    not my position, nor is it the Government's position, that

9    this defendant deserves a sentence of 600 months simply

10   because the guidelines say that that's reasonable.  It's my

11   position because I think that's what's right.

12        Turning to the nature and circumstances of this

13   offense, the nature and circumstances of it weigh heavily in

14   favor of a sentence of 600 months imprisonment.  What the

15   evidence demonstrates and has demonstrated is that this

16   defendant is a dangerous pedophile.  He has a pervasive,

17   long-standing sexual interest in prepubescent children, the

18   youngest of children.  Children who are so young they can't

19   self-report.  Children who are so fragile and tiny, they can't

20   even understand what is happening to their bodies while it's

21   happening to them.  But, Judge, someday those children do grow

22   up, and they will know full well what happened to them and

23   what that meant.

24        In 2020, this defendant did not have easy access to

25   the tiniest of children, to children who cannot report, so he

1    had to gain it.  And he did that through predatory behavior,

2    Your Honor.  That's what this was.  He sought out a mother,

3    Jamie Powell, of five children who, quite frankly, Judge, is a

4    mess of a human being.  And I'll talk about her at the time of

5    her sentencing.  But she had so much -- she was so much of a

6    mess of a person and of a mother that two of those youngest

7    children have been taken away from her, removed from her

8    custody because of endangerment.  And they were supposed to be

9    safe in the custody of the Department of Child Services, but,

10   of course, their mother was the only person allowed to see

11   them under supervised visits.  And, Judge, this defendant knew

12   all of that.  That's bourne out in the messaging that I put in

13   my brief.  And the defendant, as part of his predatory

14   behavior, first, had to convince Ms. Powell that he loved her,

15   and that's what he told her.  And he did such a good job and

16   manipulated her in such a way that she believed that he was

17   her boyfriend and asked him to move in.  And you saw from the

18   messaging, she was interested and said in her messaging to him

19   that what she wanted out of this relationship was a trusting,

20   loving adult relationship.  That's on page 25 of my brief.

21   She wanted to do things like cuddle with Mr. Smith.  But that

22   is not what Mr. Smith wanted.  But to get what he wanted, he

23   had to go through Powell, and he had to manipulate her, and he

24   had to use her, and that's what he did.

25           Undeterred by the fact that Powell's children were in

1    DCS custody and could only be seen in a supervised setting,

2    that didn't even stop him.  He began pressuring Powell to

3    fulfill deviant sexual interest in bestiality, incest, and

4    pedophilia.  Little by little -- and I try to lay it out as

5    best I could in my brief -- he pressed Powell to engage in

6    more and more and more deviant and criminal behavior.  And I

7    want to be clear today that Ms. Powell bears equal

8    responsibility.  That was that child's mother.  So I don't

9    want to detract from that.  It's just that her motivations to

10    commit these crimes are very different than Smith's.  Powell's

11    motivations were that she wanted to please Mr. Smith at any

12    cost, any cost, including putting Smith's deviant sexual

13    desires before the safety and well-being of her own children.

14    Whereas, Smith's motivations are purely sexual.  He is a

15    pedophile.  He has a sexual interest and obsession in young

16    children, including Powell's children.

17            As you saw in the messaging, he began talking to

18    Powell about bestiality first, and he asked her to engage in

19    sex acts with his dog, and she agreed.  Then he admitted to

20    Powell that his goal was to get her to engage in incest by

21    molesting her own children.  Desperate to please him, having

22    zero regard for her children, she agreed.  And at this

23    defendant's behest, she began molesting Minor Victim 1,

24    18 months old, in the presence of her other child, Minor

25    Witness 1, who is also incredibly young and while they were in

1    DCS custody.  Smith couldn't be in their physical presence.

2    The best he could do at that moment, the best he could do was

3    to ask Powell to produce child sex abuse material of that

4    molestation, come home, and distribute it to Smith, and she

5    agreed.  And that is what is at the core of this conspiracy,

6    the criminal agreement that Powell would satisfy Smith's

7    sexual desires by molesting her own child, recording it, and

8    sharing those images and video with Smith so he could enjoy

9    them, and that's what happened.

10          This is lengthy, longstanding behavior.  For months

11   and months this went on.  And at least 25 occasions that we

12   can see forensically and by comparing what is happening on the

13   phone to the visits she had at the Laser Center.  25 occasions

14   she molested her own toddler-aged child and produced child sex

15   abuse material as part of their jointly undertaken criminal

16   conspiracy.  25 visits, 577 images and videos.  486 of them he

17   stored on his phone.  Judge, that is 577 crimes spread over

18   months of abuse.  There just aren't words.  This poor tiny

19   child and her poor brother were there and had to experience

20   all of it.  They were already scared.  They were already

21   confused being in the custody of strangers, and he knew that.

22   He knew that they must be going through that, and yet, he

23   added to that abuse by asking their mother to sexually abuse

24   Minor Victim 1.

25          But even that horrifying criminal behavior wasn't

1    enough for him.  As you saw in our brief, Smith wasn't

2    satisfied with that either.  He wanted to engage, as he said,

3    the words "immediately" on page 28 in sex acts not just with

4    Minor Victim 1 and Minor Witness 1 but also with Powell's

5    teenage child, who has been identified as H.P. in our brief.

6    He pressed Smith over and over and over to continue to not

7    only molest Minor Victim 1 but to keep adding in more of her

8    children.  And he said, "No, Jamie Lee.  You don't understand.

9    I, like, literally am trying to find a way to make this

10   happen, like, within the next week.  Like, I don't think you

11   understand the severeness of that, why it's not good for me to

12   be here, and for God's sake, I want to fuck your two-year old

13   daughter and your little boy."  Those are his words.

14         Now, she should have said, oh, my goodness.  That's

15   it.  That is enough.  You're right.  I'm out of here, but she

16   didn't.  She agreed.  And that's why she's part and parcel

17   responsible for this, too.  But the only reason she didn't

18   agree to add her third child to the mix, to involve H.P., her

19   teenage aged child, was she was afraid that H.P. would tell.

20   H.P. was old enough to self-report.  Minor Victim 1 and Minor

21   Witness 1 were not.

22         She kept offering up Minor Victim 1 to Smith as

23   though it was -- as though she was an object.  Powell said,

24   I'm offering you Minor Victim 1 and you want H.P., too.  And

25   Smith said, "I know you want what you want, and I know you

1    want your two-year old daughter to be involved in our love

2    life, and I love that about you."  And Powell said, "I've

3    known you wanted to throw H.P. in, and I don't want to."  And

4    simply because she would tell, and her other children

5    couldn't.  But Smith was willing to go there and take that

6    risk and engage in more sex acts with additional children who

7    were under Powell's care.

8           Judge, even Minor Victim 1, who was incredibly young

9    at the time, knew something was wrong, and he's going to have

10    to live with that, too.  He is watching his younger 18-month

11    old sister being abused, and he had the courage to even speak

12    up and ask Powell, "Mommy, what are you doing?  What are you

13    doing?"  Causing her to flinch back because she realizes that

14    even a child of that age knows when something is wrong.  And

15    he's going to have to live with that as well, that he was

16    powerless to help his sister and help himself.

17           And, Judge, it took Powell's arrest to save those

18    children, and I say Powell intentionally because not even

19    Smith's incarceration in February of 2021 when he was picked

20    up for that probation violation was enough to deter him.  They

21    continued to communicate, and Smith continued to press Minor

22    Victim 1, even when he was in jail, and so I don't care what

23    he said to you today, Judge.  He is not going to sit here in

24    this courtroom and blame what he did on using methamphetamine.

25    First of which, there are a lot of meth users out there, and

1   that doesn't make them pedophiles.  He's a pedophile.  That's

2   what caused this criminal behavior.  And he wasn't high on

3   meth when he was in jail on April 16th of 2021, and said,

4   Before I start this message -- this is from GTL messages -- I

5   want to ask you for something.  If you're serious about me

6   being with Minor Victim 1, I want you to completely surrender

7   to what I want you to do with Minor Witness 1.  I think it's

8   only fair.  Like, I mean everything.  No questions asked.  And

9   I want North, his dog, or any like him involved from time to

10  time.  This is a person, who even after incarceration, is

11  telling her I want to molest your children.  I want you to

12  molest your children, and I want them to engage in acts in

13  bestiality from jail.  Jail wasn't even enough to deter him.

14          It was those messages and others like them that were

15  thankfully flagged by staff at the Indiana Department of

16  Correction and that is what led to quick work by the ISP

17  detectives.  They searched Powell's house.  They arrested

18  Powell.  They saved this child.

19          Judge, the nature and circumstances of this offense

20  cry out for a sentence well above 600 months, but Smith has

21  already been benefited by the application of his strategic

22  decision to plead guilty to Counts 1 and 6 and our decision to

23  not move forward with Counts 2, 3, and 4 because, yes, at that

24  point, even though his attempts over and over to jerry-rig the

25  system, to only plead to the counts he felt like he should

1    plead to, he finally got to a point where I felt justice could

2    be served, and he was at least accepting and being held

3    accountable for all his criminal conduct, including possessing

4    more than 5,000 images and videos of other children on his

5    phone.  So Count 6 was incredibly important to us as well.

6    And he's responsible for their suffering, too.  He's

7    responsible for the possessing and viewing 5,000 images and

8    videos depicting equally terrible sexual acts against other

9    prepubescent children he didn't even know.  And during that

10   same horror, horror that causes normal people, Judge, to cry

11   out in shock and in disgust and with sadness, that's the

12   horror that Mr. Smith makes him sexually aroused.  These

13   videos and images shock the conscious to normal people, but a

14   pedophile, who is a criminal like Mr. Smith, it causes him to

15   be sexually aroused.  He deserves every minute of that

16   600 months.

17         I'll turn to the history and characteristics of this

18   defendant, beginning with his personal history and mitigation,

19   and there is mitigation here.  Mr. Smith had a scatter shot

20   family history with abuse and a lot of drug use, death,

21   sadness, and that's -- if all true, that is absolutely

22   terrible.  I still say this in these cases, Your Honor.

23   Assuming Mr. Smith was molested as a child, that is awful.  It

24   is a terrible thing that this Court should consider, but it is

25   still a choice to victimize somebody else.  He made that

1    choice 577 times.

2           He reports suicide attempts, drug use, and despite

3    numerous rehabilitation classes, domestic violence prevention

4    courses, he still was hooked on drugs, still committing new

5    offenses.

6           Paragraph 102 of the PSR details the many attempts

7    that have been made to prevent recidivism by this defendant,

8    and they've all failed.  They've all failed.  So much

9    intervention and none of it has worked.  An aggravation,

10   turning to Smith's criminal history, it's dreadful.  His

11   criminal history is on pages 16 through 22 and shows a

12   lifelong pattern of criminal behavior and the commission of

13   new offenses while on probation and parole.  He has no respect

14   for the law.  None.  And I believe that his criminal history

15   under represents truly who he is because he's receiving

16   zero points for much of it.

17          Judge, his criminal history involves the distribution

18   of meth, theft, residential entry, battery of a police

19   officer, and then parole and probation revocation after

20   revocation after revocation.  This is someone who has no

21   respect for the law whatsoever.

22          Additionally, and an aggravation, let's talk about

23   his character.  I've talked about what he did, but it's also

24   important to understand who he is.  Your Honor, this case

25   would have been terrible enough if Smith had he, himself,

1    molested Minor Victim 1 or directed another person to molest

2    her, but that's not what he did here.  It's worse.  It's

3    worse.  He did something even more shocking and atrocious,

4    which is to have her own mother do it.  That's just horrible,

5    Judge, to direct a mother to molest a child.  There are no

6    words for that.  It's an offense that shocks the conscious and

7    says a great deal about Smith.  And I know he stood up here

8    today, and he apologized and is asking for forgiveness, but I

9    think his behavior over the months and with this case, I would

10   tell you if I thought he meant it.  I don't.  Some defendants

11   I do think come up here and are sincerely apologetic.  I don't

12   think so.  I've seen no evidence of sincere remorse or a true

13   understanding of the depravity of his conduct.  It's excuse

14   after excuse after excuse.

15            This child, thanks to Mr. Smith and Ms. Powell, will

16   now have to live with the knowledge that her own mother, her

17   own mother did this to her, that her own mother prioritized

18   his sexual deviant desires over her safety.  And it's just

19   hard to think of anything worse.  And despite what he said to

20   you here today, that he hopes she won't know, she's going to

21   know.  She's going to find out.  Despite our best efforts,

22   some day those poor parents who are sitting back there are

23   going to have to have a really difficult series of

24   conversations with her, and that is life-lasting pain, pain

25   that she is going to endure.

1        Judge, the messaging between Mr. Smith and Ms. Powell

2   is shocking.  The things he said that he wanted to do to an

3   innocent 18-month old, they're just horrifying.  To look at

4   that child, an 18-month old, as a sexual object, it's

5   confounding to me.  To refer to her vagina as baby -- and I'm

6   not going to say the word.  A "C" word.  It's disturbing.  To

7   talk about sucking her "P" and making that toddler drink her

8   own mother's "P," there aren't words to encapsulate that level

9   of depravity.  And to plan on molesting that child and forcing

10  her to engage in bestiality.  I won't repeat all the terrible

11  things he said.  I put some of them, not even all of them, in

12  a brief, but it's not to spare Mr. Smith.  He should have to

13  sit and listen to them, but I'm not going to do it to her

14  parents.  I'm not going to do it.  But you saw those messages

15  and you know what he planned to do if he ever got out.  It was

16  just going to get worse.

17       Thank goodness he was arrested and Powell was

18  arrested before Minor Victim 1 and her brother were sent home,

19  before they were sent home and subjected to more abuse.

20       Judge, turning to deterrence and promoting respect

21  for the law.  I don't -- my point on deterrence is I don't

22  think Smith can be deterred.  I think that's demonstrated in

23  his criminal history, conviction after conviction, lengthy

24  sentences, including a 16-year sentence, probation, parole,

25  rehab, intervention.  They've all failed.  And so I think this

1   is a person who has demonstrated he can't be deterred, so he

2   must be removed from society because society needs protection

3   from him, and that's why we are asking for the sentence we are

4   in this case.  Society needs permanent protection from

5   Mr. Smith.  His level of obsession won't go away.  He won't

6   age out of this behavior.  He can recidivate even when he is

7   older.  Keep in mind, he was able to commit all these crimes,

8   and he wasn't even in the room with this toddler.  He wanted

9   to be.  That was his plan, but he was arrested and prevented

10  from doing that.

11         I'll end with just punishment, Your Honor.  For years

12  now, Minor Victim 1's adoptive parents have shown pictures of

13  her to us.  They've kept us updated on her development and her

14  progress, and she is, as I'm sure you saw, just a bright,

15  beautiful child, and I am so grateful for her adoptive

16  parents.  I am so relieved and grateful they are in her life.

17  They so clearly love her, but as you heard them say so

18  eloquently today, they face such a battle.  Someday she will

19  be old enough to ask questions, and she will ask those

20  questions.  What happened to my mom, my real mom?  What did

21  she do?  What did she do to me?  And why did she do it?  And

22  no matter how you address it, she's going to ask those

23  questions, and they're going to be faced with that reality,

24  but more important, Minor Victim 1 will be faced with it

25  forever.  And I can't tell them, nobody can, how that will

1    impact her, what it will do to her, to live with the knowledge

2    that your mom sexually abused you to make him happy, that she

3    did so without even putting so much up as a small fight and

4    that she did it for him.

5           He preyed on this already broken family.  He is a

6    predator.  He is responsible for that, just as Powell is, and

7    there has to be just punishment for it.  The United States is

8    seeking a guideline sentence of 600 months imprisonment, a

9    lifetime of supervised release.  We are also asking that his

10   sentence is to be served consecutively for his undischarged

11   term of imprisonment for dealing in methamphetamine,

12   possession of methamphetamine, and battery of a police

13   officer, completely separate offenses, and he hasn't

14   discharged that sentence of imprisonment.  We are asking, and

15   the defendant has agreed, to a restitution amount of $10,000,

16   and for all of those reasons, Your Honor, we are asking that

17   that sentence be imposed.  Thank you.

18           THE COURT:  Thank you, Ms. Preston.

19           Mr. Edgar, would you and Mr. Smith come back up?

20           All right.  The Court has reviewed the information

21   contained in the Presentence Investigation Report, has

22   consulted the advisory guidelines, has heard comments from

23   counsel for the defendant, counsel for the Government,

24   defendant did make a statement, also there was a victim impact

25   statement made as well.

1          The Court now turns to factors set forth in 3553(a),

2   factors to be considered in imposing a sentence.  The Court

3   shall impose a sentence sufficient but not greater than

4   necessary to comply with the purposes set forth in the code.

5   Court shall consider the nature and circumstances of the

6   offense and the history and characteristics of the defendant.

7          Nature and circumstances of the offense, of course,

8   we've gone over that many times today, very thoroughly today.

9   Defendant was involved in a conspiracy to commit sexual

10  exploitation of a minor and also possession of visual

11  depictions of minors engaged in sexually explicit conduct.

12  Count 1, of course, involves Minor Victim 1.  Count 6 involves

13  hundreds and hundreds of children all across the world who are

14  involved involuntarily, obviously, in performing and being

15  photographed in sexually explicit positions and poses.

16          I've been doing this for -- sentencing people for --

17  on criminal convictions for 35 years.  Prior to that, I was a

18  defense attorney.  I represented people, such as yourself.  I

19  represented murderers.  I represented almost every kind of

20  individual and crime that comes through our system, so I've

21  basically seen and heard just about everything over all these

22  years of my 45 years of law practice and judiciary.  It's hard

23  to believe it's that long, but time marches on.  I have to say

24  that this might be the most depraved criminal conduct I've

25  seen in all those years.  And believe me, I've seen and heard

1    of horrible conduct.  I've seen pictures and photos and videos

2    and brutal murders.  Obviously, sex offenses as well.  But

3    this is at the top.  Not only was this an 18-month old victim

4    but you manipulated your codefendant, Ms. Powell, to -- and

5    basically ordered her -- I read the exhibits.  I read your

6    texts.  You're directing her to commit these acts on Minor

7    Victim 1.  You can't deny that.  And to direct a mother to do

8    this to her own child, an infant, toddler, for your own sexual

9    gratification.  You just didn't want to watch -- look at these

10   things.  This was for your own sexual gratification.  And you

11   described yourself as a depraved individual, as a monster.  I

12   think those are probably pretty accurate depictions here.

13   There is no explanation.  There is no -- it's just hard to

14   comprehend what you did here and how you did it and for how

15   long you did it.  Obviously, you're a pedophile.  You have a

16   long-term interest in minor children.  You had many images and

17   videos in your possession of children involved in sexually

18   explicit images on your phone.  I'm sure those were viewed

19   quite often as well.  And then, of course, Minor Victim 1.  So

20   two separate offenses involving many, many different

21   individuals -- children here.

22          I'm not going to go into -- your attorney and

23   Ms. Preston indicated that maybe you were trying to game the

24   system here a little bit in terms of whether you were going to

25   plead guilty or not plead guilty.  Believe me, you didn't game

1    the system here.  I've been around long enough to know when

2    someone is trying to game the system or not.  I believe your

3    attorney indicated that you just didn't really know what you

4    wanted to do and were having difficulty understanding the

5    seriousness and the potential penalties that were involved

6    here upon a conviction, and I understand that, and I was

7    willing to be patient and give you an opportunity to discuss

8    all this with your attorney, and I understand that it takes

9    some time to understand what you did will come in front of a

10   jury, that the evidence was extremely strong here, text --

11   paper trail.  There would be testimony from your codefendant

12   and all that.  So I was willing to give you time to figure all

13   that out, and you finally did.  It's not the result that the

14   Government actually wanted here.  I think they wanted

15   convictions on all counts, but they came to realize, too, that

16   efficiencies here might come into play as long as they receive

17   convictions for Minor Victim 1, and, of course, all of the

18   victims in Count 6 as well.  So there was no -- I'm not saying

19   you gamed the system or not.  You didn't.  And here we are at

20   sentencing, and you're -- you're going to face a lengthy

21   sentence here.  There's no question about that.  And I know

22   Mr. Edgar, he's worked extremely hard representing you in this

23   case.  Difficult case for any criminal defense attorney to

24   represent, and we all appreciate his representation here.

25           History and characteristics of the defendant.

1    Defendant, there's no question, had a difficult, chaotic

2    childhood involving drugs, abuse.  Parents were involved with

3    drugs.  He was abused by his mother and other relatives,

4    friends.  Defendant has had a long history of substance abuse

5    as well.  But certainly, that's -- that's no excuse for his

6    actions.  The Court is convinced the defendant is a pedophile

7    and, of course, that's a mental illness, and part of your

8    sentence is going to be that you be evaluated for mental

9    health treatment, as well as substance abuse treatment as

10   well.

11           Defendant presented a statement today offering his

12   remorse.  That's true in every case.  No one comes up here and

13   tells me, Judge, I'm not sorry for what I did.  That's not

14   something that happens.  Most people are sorry that they got

15   caught.  They're not so sorry about what they did.  And as a

16   pedophile, you understand that that's an addiction, right?

17           THE DEFENDANT:  Yes, sir.

18           THE COURT:  You're addicted to child pornography, and

19   people who have addictions, whether it's child pornography or

20   sex addictions or alcohol and substance abuse addictions or

21   drug addictions, there's no switch.  You just can't turn that

22   off.  There's no switch that says I'm addicted, and then you

23   push it down, and I'm no longer addicted.  That's a lifelong

24   addiction that you have.

25           Some people who receive treatment for their addiction

1    are successful.  They go on about their life, and they don't

2    relapse.  Many people I see do relapse over the years, and

3    they come back into court, and I see them again, and I see

4    them again.

5         So I don't know what's going to happen with you.

6    Hopefully, you'll take advantage of treatment at the Bureau of

7    Prisons regarding your child pornography addiction and

8    pedophilia and substance abuse.

9         Need for the sentence imposed to reflect the

10   seriousness of the offense, promote respect for the law, and

11   provide just punishment for the offense.  I don't think we

12   have to go much further in describing the seriousness of this

13   offense.  I could talk for another five minutes about the

14   seriousness.  I think we all agree that it's a very serious

15   offense that you committed here, that -- not only in Count 1,

16   Minor Victim 1, eventually, more than likely will find out

17   what happened here with her mother and you, and certainly that

18   will be with her for the rest of her life.

19        In Count 6, all these victims, as I said, they're --

20   they don't voluntarily pose for these sexually explicit

21   depictions.  They're forced to do that.  And those are

22   distributed on the internet, and, of course, as we all know,

23   once something's on the internet, never disappears.  And so

24   when they get to be older, and they recall all this, they go,

25   I wonder who's looking at me now.  Those -- those thoughts

1   never leave either.  So extremely serious offense.

2          Promote respect for the law.  Any sentence we impose

3   we hope promotes respect for the law.  You've been in and out

4   of courtrooms and out of jail cells for quite sometime.

5   You've been revoked several times.  I've got concern about

6   your respect for the law, and I'm going to consider that in

7   determining the appropriate sentence.  And, of course, any

8   sentence we impose, the Court believes that it's a just --

9   fair and just sentence.

10          Afford adequate deterrence to criminal conduct.  I

11  give great weight to this factor.  Once this sentence is

12  communicated and published to the community, hopefully others

13  who are contemplating this type of conduct or committing

14  similar conduct will think twice before going forward because

15  if you're caught, it's a serious penalty that's involved.  I

16  don't know how much success we're having with deterrence.  The

17  criminal numbers keep going up and up every year, but we have

18  to continue to try to deter individuals such as yourself and

19  others from committing similar crimes.

20          Protect the public from further crimes of the

21  defendant.  Mr. Smith, what makes you think I've got any

22  confidence that once you're released, you're not going to go

23  back to do this type of criminal activity?

24          THE DEFENDANT:  I don't know, Your Honor.  If I'm

25  being honest, I don't know.

1          THE COURT:  Yeah, you don't know, and we don't know.

2    So that's certainly a factor as well that I have to consider,

3    and I give great weight to that factor as well.

4          Provide the defendant with needed educational or

5    vocational training, medical care, or other correctional

6    treatment in the most effective manner.  You indicated you

7    have some desire to learn vocational skills, plumbing,

8    construction --

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  -- those types of things.  Also, medical

11    care.  As I indicated, I'm going to ask the Bureau to evaluate

12    you for mental health issues and also substance abuse

13    treatment as well.  You appear to be in good physical health.

14    You indicated in your Presentence Report that no real problems

15    on that and minor prior diagnoses as well of mental health and

16    so the Bureau will be ordered to address those conditions as

17    well.

18          And also to avoid unwarranted sentence disparities

19    among defendants who have been convicted of similar crimes and

20    have similar backgrounds.  The Court believes a guideline

21    sentence would not be unwarranted sentence disparity.  And

22    also restitution.  And my understanding is you've agreed to

23    make restitution?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  All right.  All right.  The Court has

1   consulted the advisory guidelines, heard comments from

2   counsel, has considered factors set forth in 3553(a), is now

3   ready to impose judgment and sentence.

4        Mr. Edgar, do you know of any legal reason why the

5   Court cannot impose judgment and sentence?

6        MR. EDGAR:  I do not, Your Honor.

7        THE COURT:  Ms. Preston?

8        MS. PRESTON:  I do not, Your Honor.

9        THE COURT:  All right.  Court enters judgment and

10  conviction on Count 1, conspiracy to commit the sexual

11  exploitation of a minor, a violation of 18 U.S. Code 2251(a)

12  and (e) and Section 2.  Court enters judgment and conviction

13  on Count 6, possession of visual depictions of minors engaged

14  in sexually explicit conduct, a violation of 18 U.S. Code

15  Section 2252(a)(5)(B).

16       Pursuant to the Sentencing Reform Act of 1984, it is

17  the judgment of the Court the defendant, Richard Smith, is

18  hereby committed to the custody of the Bureau of Prisons to be

19  imprisoned for a term 360 months on Count 1 and 240 months on

20  Count 6, consecutive for a total of 600 months.

21       While incarcerated, defendant shall participate in

22  the residential sex offender treatment program, mental health

23  treatment, vocational training, and RDAP and prison

24  industries.  There is restitution in an agreed upon amount of

25  $10,000, and the Court will sign that order -- agreed upon

1   order today.  The Court is not ordering a fine based on

2   defendant's currently financial resources and future inability

3   to pay in addition to the restitution obligation.  He shall

4   forfeit to the United States the following items that are

5   currently listed in the Presentence Investigation Report, and

6   I previously had issued a preliminary order of forfeiture, and

7   those items will be forfeited.

8           Supervised release is required by statute.  The Court

9   is imposing a term of life of supervised release on each of

10  Counts 1 and 6 concurrent upon the release from imprisonment,

11  based on the nature of the offense, personal history and

12  characteristics of the defendant, the need to protect the

13  public, and to assist in the defendant's reentry into the

14  community.

15          While on supervised release, defendant shall not

16  commit another federal, state, or local crime, shall cooperate

17  with the collection of a DNA sample, and shall refrain from

18  any unlawful use of a controlled substance, and shall submit

19  to one drug test within 15 days of placement on supervised

20  release and two periodic tests thereafter as directed by the

21  probation officer.

22          Defendant shall also comply with the requirements of

23  the Sex Offender Registration and Notification Act, United

24  States Code Section -- 34 United States Code Section 20901.

25  Restitution is a condition of supervised release and defendant

1    will pay in accordance with a schedule of payments.

2            Further, defendant shall comply with the following

3    additional conditions.  And Mr. Smith, you'll recall when we

4    reviewed your Presentence Investigation Report, I asked you if

5    you had been able to read and discuss with your attorney the

6    mandatory and proposed conditions of supervision?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  You indicated to me you had done so?

9            THE DEFENDANT:  Yes.

10            THE COURT:  And you had no objection?

11            THE DEFENDANT:  No, sir.

12            THE COURT:  I can read those conditions to you or you

13    can waive my reading of those to you.

14            THE DEFENDANT:  I waive them.

15            THE COURT:  You've discussed them with your attorney?

16            THE DEFENDANT:  Yes, sir.

17            THE COURT:  All right.  Further order defendant pay a

18    mandatory special assessment fee of $100 per count for a total

19    of $200.  Court is imposing a $100 assessment per count for a

20    total $200 pursuant to 18 U.S. Code Section 2259(a), the Amy,

21    Vicky, and Andy Child Pornography Victim Assistance Act.

22    Payment of this special assessment is due immediately, made

23    directly to the clerk of the United States District Court.

24    The Court is not imposing an assessment pursuant to 18 U.S.

25    Code Section 3014, the Justice For Victims of Trafficking Act

1    because the defendant is indigent.

2            The sentence in this cause number shall run

3    consecutive to his uncompleted state court sentence.

4            All right.  You have a right to appeal the conviction

5    and sentence in this case.  You understand that, Mr. Smith?

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  All right.  If you wish to appeal,

8    discuss it with your attorney.  If you wish to file an appeal,

9    you must file a notice of appeal with the clerk of the Court

10    within 14 days of entry of judgment in this matter.  Do you

11    understand this?

12            THE DEFENDANT:  Yes, sir.

13            THE COURT:  And if you wish to appeal, Mr. Edgar

14    will file that notice for you.  He will not represent you in

15    the appeal, but he will file that notice for you.

16            THE DEFENDANT:  Okay.

17            THE COURT:  BOP recommendation here?

18            MR. EDGAR:  He is requesting recommendation for FCI

19    Tucson or FCI Elkton.  We believe both of them have sex

20    offender management programs.

21            THE COURT:  All right.  Court recommends the

22    defendant be housed in a Bureau of Prison facility which has

23    sex offender treatment program.  There are several around the

24    country.  Defendant specifically requests Tucson, Arizona, or

25    Elkton Bureau of Prison facility.  The Bureau tries to follow

1    our recommendations the best they can.  However, sometimes

2    they cannot due to space limitation or security level

3    requirements, but they'll do their best to follow our

4    recommendations.

5         All right.  I've got an order here on restitution.

6    I'll go ahead and execute that here today.  It's approved.

7         Any questions about anything, Mr. Smith?

8         THE DEFENDANT:  No.  I just -- I want to thank you

9    for giving me the time that you did.  I don't deserve to be on

10   the streets, but I also don't deserve to have the picture

11   painted of me that is painted of me.  A lot of my

12   characteristics are shown on the paper that you read -- that

13   you read out loud that she said.  99.8 percent of it is

14   absolutely true.  But the picture that you guys have of my

15   codefendant is not right.  I don't -- from the beginning, Your

16   Honor, I didn't care about the time.  I don't deserve -- I'm

17   not good out there.  I don't deserve out there.  I don't need

18   out there.  I know what I am, and I know who I am, and I'm

19   messed up bad.  But to paint a picture of somebody you guys

20   don't know except what you see on that paperwork is not right.

21   For you guys to -- no matter what they said, no matter what

22   she said, nobody can kick me as far as I've kicked myself.

23   I've done it all my life.  I don't need nobody else to do it,

24   but I'm glad somebody else sees what I see in myself, but make

25   sure you guys paint the correct picture when it comes to other

    1    people.  Don't -- it's not fair for you guys to say, oh,

    2    somebody's innocent, and I forced -- I didn't force anybody to

    3    do --

    4            THE COURT:  No, no, no.

    5            THE DEFENDANT:  No.  No, no, no.  I listened --

    6            THE COURT:  I don't think anybody --

    7            THE DEFENDANT:  I listened to you.

    8            THE COURT:  -- is saying Mrs. Powell --

    9            THE DEFENDANT:  I listened to you.

   10            THE COURT:  -- is innocent.

   11            THE DEFENDANT:  I'm -- I should have a right to

   12    speak.

   13            THE COURT:  Yes.

   14            THE DEFENDANT:  And all I'm saying is you guys are

   15    painting the wrong picture.  It doesn't matter.  I was

   16    comfortable with 160 years, but I didn't -- what I wasn't

   17    comfortable with is accepting something I did not do.  Because

   18    I wrote something -- I tried to leave to California.  I tried

   19    to go.  I was on the run.  I'm the one who went on the run.

   20    I'm the one who had $20,000 in my pocket.  I wanted to go.

   21    Jamie begged me to stay.  So the picture that you guys got

   22    painted is wrong, and you're wrong, and it's okay, though,

   23    because I'm going where I deserve to be, and I'm very, very

   24    grateful and thankful for that.  I'm blessed for that.  And

   25    that's all I have to say.

1              THE COURT:  All right.  Thank you.

2              Mr. Edgar, anything else today?

3              MR. EDGAR:  Nothing further from me, Judge.  Thank

4    you.

5              THE COURT:  Any motions on 2, 3, and 4, Ms. Preston?

6              MS. PRESTON:  The United States moves to

7    dismiss Counts 2, 3, and 4 of the original indictment.

8              THE COURT:  All right.  Any objection?

9              MR. EDGAR:  No, Your Honor.  Thank you.

10             THE COURT:  Counts 2, 3 and 4 of the original

11   indictment are dismissed on motion of the Government.

12             We'll show him -- Mr. Smith remanded to the custody

13   of the marshal.  Thank you all very much.

14             THE CLERK:  All rise.  Court is in recess.

15

16                 ***************************

17

18                 CERTIFICATE OF COURT REPORTER

19   I, Elizabeth Taylor Culiver, RPR, FCRR, certify that the

20   foregoing is a correct transcript from the record of

21   proceedings in the above-entitled matter.

22

23   S/s Elizabeth Taylor Culiver_____  May 2, 2025
     ELIZABETH TAYLOR CULIVER, RPR, FCRR
24   Official Court Reporter
     Southern District of Indiana
25   Evansville Division